UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JACQUIS LAMONT LEICHMAN,

Petitioner,

v.                                                    Case No. 18-cv-1935-pp

WARDEN SCOTT ECKSTEIN,

Respondent.

**ORDER DENYING AMENDED PETITION FOR WRIT OF *HABEAS CORPUS*
UNDER 28 U.S.C. §2254 (DKT. NO. 19), DISMISSING CASE AND DENYING
CERTIFICATE OF APPEALABILITY**

On December 7, 2018, the petitioner filed a petition for writ of *habeas
corpus* under 28 U.S.C. §2254 challenging his 2013 first-degree intentional
homicide conviction for the shooting death of Kenda Baker. Dkt. No. 1. He filed
an amended petition on March 9, 2021. Dkt. No. 19. The respondent has filed
an answer, dkt. no. 24, the petitioner has filed a brief in support of his petition,
dkt. no. 27, the respondent has filed an opposition brief, dkt. no. 41, and the
petitioner has filed a reply in support of the petition, dkt. no. 42. It has taken
this court far, far too long to review the briefing, and the court apologizes to the
parties for its delay. This order dismisses the petition and the case.

**I.      Factual and Procedural Background**

    A.      <u>Underlying State Case</u>

        1.      *The State Charge*

On June 24, 2011, the State filed a complaint in Milwaukee County
Circuit Court charging the petitioner with one count of first-degree, intentional

1

homicide. <u>State v. Leichman</u>, Case No. 2011CF2926 (Milwaukee County Circuit Court), available at https://wcca.wicourts.gov.

In its order affirming the petitioner's conviction and denial of postconviction relief, the Wisconsin Court of Appeals briefly described the facts underlying the charge:

> On June 17, 2011, a group of women was standing on a Milwaukee street. [The petitioner's] aunt, Felicia Leichman, approached the group and began to argue with them. Kenda Baker, the brother of one of the women in the group, was nearby and told Felicia not to insult his sister. The other women had to separate Felicia and Baker. A man then walked up and shot Baker multiple times, killing him. Felicia and at least one of the women identified [the petitioner] as the shooter.

Dkt. No. 27-3 at ¶2.

2.      *The State Trial*

On November 6, 2012—months before trial—the petitioner's counsel filed his witness list. <u>Leichman</u>, Case No. 2011CF2926. The petitioner has filed that witness list in this federal *habeas* case; it advised that the defendant "may call" witnesses Willa Leichman, Marshall Smith, Tabitha Jones, Vincent Juarez, Detective Keith Kopcha, Detective Elizabeth Stewart and Detective Charles Mueller. Dkt. No. 27-1 at 8.

On May 20, 2013, the petitioner had a jury trial on the homicide charge. The morning of trial, before the jury panel arrived, the parties had a discussion with the judge. The following exchange occurred:

> [DEFENSE COUNSEL]:  The other issue—and I don't know who the State had under subpoena, actually has subpoenaed. I mean, I know who is on the witness list. But the other issue, I guess, I would like to exclude is the issue of the letter that was recovered from Randy Johnson that the State describes as sort of a hit list on the

2

witnesses. I'm assuming Mr. Johnson isn't going to testify, so I would like to keep out any reference of that.

THE COURT: And I'm not familiar with that letter. Response of the State?

[PROSECUTOR]: The letter is, I think, a hit list. I think that it's relevant. I think that arguments that have maybe—just to tell the Court during the midst of this prosecution, months into the case, a person by the name of Randy Johnson as well as two other people were stopped in a car and inside of the car. Among other things was a letter, which is a hit list and written by the Defendant, to have them go visit certain of the people that are on the witness list.

THE COURT: How could the State intend to get this in?

[PROSECUTOR]: It is—I will show the Court the letter first.

THE COURT: Sure. Are you filing this with the Court?

[PROSECUTOR] No. I'm just asking the Court to look at it. I can make a copy for the file at a later time.

(Short recess taken.)

THE COURT: Okay. I've reviewed it.

[PROSECUTOR]: And based upon that letter, and the State did come on an ex parte motion before Judge Dallet to have restrictions placed upon the Defendant, I think the fact that it was recovered by the police at this specific plea, the people on the witness list, it has the return address of [the petitioner] at the jail, and words that he's been known to use "death before dishonor" on that letter, I think that while certainly it doesn't prove beyond any doubt that he is the author of the letter, I think it's sufficient that the jury should be able to consider—

THE COURT: But how would you get it in? What foundation would you be able to lay?

[PROSECUTOR]: The foundation is the letter was recovered during the traffic stop. We'll have the traffic officers here. The—the—it was taken into custody. It was processed and looked at in terms of fingerprints and DNA. There were none applicable here. The letter came from the jail and has his return address on it. I'll have to look. I mean, it's something we're not going to get to today, but something

3

that there's additional elements of foundation that the State would intend to put in. I don't want to misspeak to the Court.

THE COURT:      All right. Well, let me just say if the foundation can be laid, I think it's admissible. I mean, I think the State can argue that it's evidence of guilt and I think it's very prohibitive[1] in that regard. If you can't lay the foundation, then there's no way for it to get in.

[PROSECUTOR]:   Okay. So it's a foundational issue as opposed to prejudice?

THE COURT:      Yeah.

[DEFENSE COUNSEL]: Right. But unless they can get Randy Johnson in here to testify that he got that letter, I don't see how that's coming in.

THE COURT:      Well, I'm going to wait and let [the prosecutor] figure out how he can get it in, and then I will rule, but I do think that its prohibitive value is not substantially outweighed by the standard of unfair prejudice.

[DEFENSE COUNSEL]:  So there will be no mention in opening until we resolve that?

[PROSECUTOR]:   Right.

*******

THE COURT:      And does the original actually contain his last name? The way that photocopy appeared, his last name is cut off.

[PROSECUTOR]:   No. This is the best.

[DEFENSE COUNSEL]:  Yeah, that's the way it looks in real life.

Dkt. No. 24-22 at pp. 11, lines 11-25; 12-13; 14, lines 1-21.

During jury selection, the judge advised the jury panel that she was

going to have the lawyers introduce themselves and "read to you the names of

---

[1] The court suspects that the court said "probative," rather than "prohibitive," and the court reporter misunderstood.

4

any witnesses they might call or names that just might come up in the process of the trial." <u>Id.</u> at pp. 26, lines 24-25; 27, lines 1-3. She assured the jury that "all of those names are not likely to be in fact called as witnesses, but the idea is just to see if you might know anyone who, A, might be a witness, or B, just might in some way be involved with the facts that are alleged here." <u>Id.</u> at p. 27, lines 4-8. Among the potential witnesses the prosecutor named was "Vincent Juarez." <u>Id.</u> at p. 28, lines 23-24. The defense attorney said that "[p]possible witnesses" were "Willa Leichman" and "Vincent Juarez." <u>Id.</u> at 29, lines 18-21. None of the jurors advised the court that they knew either of these individuals, or any of the other individuals the lawyers had named.

Before opening statements, and outside of the presence of the jury, the judge ruled on motions *in limine,* and reiterated that she had denied the defense motion to prohibit the prosecution from introducing testimony or evidence regarding the letter taken from Randy Johnson, assuming that the State could lay a foundation. Dkt. No. 24-23, p. 12 at lines 7-13.

On the second day of trial, the issue of the letter found on Randy Johnson came up again:

> THE COURT:      . . . I also realized that we did have one more topic that we discussed in chambers this morning and that was the State's effort to lay foundation in this letter, the hit list letter, if you will. And the State kind of went through real quickly how it thinks it's going to connect all this back to [the petitioner], and there are a couple of issues that I think are perhaps the most thorny.
>
> One of them is that it apparently has his pod listed on the return address, and I'm not sure how the State is going to get in that he was in fact at that pod. Perhaps it has certified records. I'm not sure. Maybe there's someone who has personal knowledge of that, I don't

5

know, but I think that's something the State is going to have to think about.

But one of the other links in the foundation chain that the State mentioned was that it believes Ms. Leichman, Felicia Leichman, was sent letters from the Defendant that she may be able to testify that she's familiar with his handwriting. And if she can, I think that that is a fair part of the authentication chain. And for that I would cite [Wis. Stat.] 909.015(2), which pertains to nonexpert opinion on handwriting, and that can be based upon familiarity not acquired for purposes of this litigation. So she may well have that knowledge. I don't know. But the State is certainly entitled to inquire.

Also in terms of authentication, 909.015(4), distinctive characteristics and the like, appearance, content, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances, can serve to further authentication or laying of foundation.

If the content itself references witnesses in this case or other identifiers associated with this case, coupled with recognizing the handwriting, coupled with finding it on the person of a person that can be established as a friend who had a picture apparently of [the petitioner] in his pocket at the time he was picked up and was someone who can lay the foundation that [the petitioner] was in pod 5, et cetera. I mean, if the State can put all those links together, I think that's going to be fair identification, but I just wanted to put on the record some of the statutory bases for the legal justification of that being a fair sort of constellation of foundation facts that may well lead to the admissibility of this letter.

No one should be talking about the contents of the letter. We talked about whether we want to have any of this foundation laid outside the presence of the jury. I think it's unworkable to do that.

I just think that either the foundation is going to get laid or it's not. And if she can't recognize the handwriting, it's never going to get admitted, and no one is going to talk about the contents. The jury might wonder what was in it, but they're not allowed to speculate, so I think that's the way the process works.

[Prosection], anything to add to that record?

[PROSECUTOR]: No. Other than that the Court wouldn't foreclose the possibility of other foundation no matter what—

6

THE COURT: Yeah. It's not exhaustive. I was just using some examples you gave. And in particular the handwriting because I think [defense counsel] wasn't sure whether that was fair game. But, clearly, 909.015(2) says that it is assuming she has familiarity with the handwriting.

[DEFENSE COUNSEL]: My understanding is we were going to do that as a proffer outside the presence of the jury.

THE COURT: Well, we could do that if you prefer.

[DEFENSE COUNSEL]: Well, yes. I think that's the appropriate way to do that rather than show the jury some mystery piece of paper. I think we have to do it—if that's going to be a piece of foundation, then I think this should be done outside the presence of the jury.

THE COURT: Any objection to—

[DEFENSE COUNSEL]: I don't think the State is planning on calling Ms. Leichman today.

THE COURT: I know. I was just rounding out the record.

Any objection, [prosecution], to proceeding with a quick examination for foundation before the jury gets her testimony?

[PROSECUTOR]: No.

THE COURT: I don't see why not. We may as well out of an abundance of caution. But that doesn't preclude you from asking some of the other links in the chain because those are all different witnesses.

Okay. I think that rounds out where we are on that issue . . .

Dkt. No. 24-24, pp. 73, lines 2-25; 74-75; 76, lines 1-20.

Tabitha Jones also testified at the trial. Dkt. No. 24-24 at pp. 87-134;

Dkt. No. 24-25 at pp. 41-65. Jones testified that she arrived at the location of

the incident around 9:30 or 10:00 p.m. Dkt. No. 24-24 at p. 87, lines 17-20.

She said she was there with someone named Tyeisha (whose last name she did

7

not know), someone named Latia, or Tia (whose last name she did not know) and "Kendall," Tyeisha's brother. Id. at p. 88, lines 5-22. She testified that "Kendall" was Kenda Baker. Id. at p. 89, lines 1-2. She said that when she arrived, she met her sister, Kelly Carson. Id. at lines 18-24. Jones testified that at some point in the evening, "Felicia" came down the street. Id. at p. 95, lines 22-25. She described Felicia as the auntie of the petitioner, whom Jones called "Jacquis." Id. at p. 96, lines 1-21. Jones described the petitioner as "an associate from the neighborhood," and as someone she "used to buy from." Dkt. No. 24-24 at p. 98, lines 10-21.

Jones testified that when Felicia Leichman arrived at the scene of the incident, she said "many disrespectful words." Id. at p. 102, lines 19-24. Jones described an argument among the women present. Id. at pp. 103, lines 1-25 to 104, lines 1-16. She described Kenda Baker jumping in to defend his sister Tyeisha, who was in the group. Id. at pp. 105, lines 10-25; 106-107; 108, lines 1-21. Jones said that she physically got between Felicia and Kenda Baker, and told her sister Kelly Carson to "go get someone." Id. at p. 106, lines 13-25. She described her Kelly leaving the scene. Id. at p. 107, lines 11-14. She described seeing Kelly coming back down the street, and then seeing the petitioner running with a gun. Id. at pp. 108, lines 10-25; 109-110. Jones testified that she saw the petitioner run up to Kenda Baker and hit him with the gun multiple times. Id. at p. 111, lines 1-23. She testified that she was about "[f]ive feet maybe" from Kenda Baker when she observed this. Id. at p. 112, lines 2-3. She described hearing a shot go off and seeing Kenda Baker fall and the

8

petitioner standing over Baker. Id. at lines 21-25; p. 113, lines 1-22. She testified that she then heard "a lot of gunshots." Id. at 114, lines 1-2. She testified that she saw Baker being hit with bullets. Id. at lines 11-18. She said she thought she'd heard five or six shots. Id. at p. 117, lines 8-13. She testified that she saw the petitioner shoot the gun one time but heard other shots. Dkt. No. 24-25 at pp. 60, lines 4-8; 61, lines 1-5; 64, lines 7-23.

Jones also testified that she knew someone named Randy Johnson; she said that he "talked to" one of her sister's friends. Dkt. No. 24-24 at p. 119, lines 12-15. Jones testified that she had seen Randy Johnson at Felicia's house. Id. at pp. 119, lines 22-25; 120, lines 1-16. She testified that she had seen the petitioner with Randy Johnson at Felicia's house about three times. Id. at lines 17-25. She testified that she'd been shown a photo array and had been able to select Randy Johnson from it. Id. at pp. 130, lines 23-25; 131, lines 1-3.

Cassandra Hernandez testified that she was across the street in her apartment when she witnessed a woman pushing a man. Dkt. No. 24-24 at pp. 148, lines 15-25; 149, lines 1-15. According to Hernandez, a Black man approached and shot the man who was being pushed. Id. at p. 150, lines 3-24. Hernandez explained that she couldn't see the shooter's face but that she believed that "he was a black male, he was about 5'8", kind of stocky, wearing a black shirt, gray shorts, had a gray hat on." Id. at p. 151, lines 12-18.

The State called the petitioner's aunt, Felicia Leichman Caldwell. Dkt. No. 24-26 at pp. 67-136. Before Felicia took the stand, and outside the

presence of the jury, the parties questioned her about some letters. Id. at pp. 55-66. The prosecutor showed her Exhibit 64, the letter found with Randy Johnson. Id. at p. 57, lines 19-22. Felicia testified that she'd never seen Exhibit 64 before, but she recognized the saying "death before dishonor" written on it (the same saying tattooed on the petitioner's neck), and she recognized the handwriting. Id. at pp. 58, lines 2-25; 59, lines 1-4. When shown Exhibit 68, Felicia identified it as a letter in the petitioner's handwriting, sent to her at the Milwaukee County House of Correction. Id. at pp. 59, lines 15-25; 60, lines 1-15. She recognized Exhibit 67 as a letter in the petitioner's handwriting, sent to her at the House of Correction after the petitioner's arrest. Id. at p. 61, lines 1-21. The prosecutor then moved admission of the letters and their envelopes, and the court admitted them without objection. Id. at pp. 62, lines 18-25; 63, lines 1-2. On cross-examination, Felicia said that she did not recognize the handwriting in the letters. Id. at p. 63, lines 16-25; 64, lines 1-7. She testified that she did not know whether the petitioner had written Exhibit 64 (the letter found with Randy Johnson). Id. at p. 65, lines 13-14. The court concluded that at that point, the State had made a sufficient offer of proof to allow the prosecutor to ask questions about the letters in front of the jury. Id. at p. 66, lines 7-15.

After the jury returned to the courtroom, Felicia testified that she lived with the petitioner, his children and Randy Johnson (whom she also referred to as "Diesel") at an address on West Mineral Street in Milwaukee. Id. at p. 68, lines 16-25. She testified that the petitioner dated Tabitha Jones, who had a

10

sister named Kelly Carson (also known as Poopoo). Id. at page 72, lines 19-25. Felicia testified that sometime after 8:00 p.m. on June 17, 2011, she walked from her residence to another address on West Mineral to see Jones and Carson. Id. at page 74, lines 7-25. She testified that as she was talking with Jones, Carson and some other women, she "said something" to one of the women; at that point, Kenda Baker (the victim) jumped from the stairs and told Felicia that if she called his sister a "B" again, he was going to "F" her up. Id. at pp. 75, lines 17-25; 76, lines 1-4. Felicia testified that she "got in [her] defense mode," id. at p. 78, lines 16-23, and an argument ensued, id. at pp. 79, lines 1-25; 80, lines 1-20. She testified that as Kenda Baker was coming at her, she saw her nephew—the petitioner—come past her. Id. at pp. 80, lines 22-25; 81, line 1. Felicia testified that she noticed the petitioner, whom she identified by name, had a gun in his hand. Id. at p. 85, lines 17-24. She testified that she then saw the petitioner hit Kenda Baker multiple times with the gun. Id. at p. 89, lines 3-24. Felicia then saw the two—Kenda Baker and the petitioner— begin "tussling." Id. at pp. 89, line 25; 90, lines 1-25. She saw the two fall over a fire hydrant, to the ground, then saw the petitioner shoot Kendra Baker in the chest. Id. at p. 91, lines 1-21. She testified that she saw the petitioner get up, then shoot Kenda Baker a second time. Id. at p. 92, lines 9-16. She estimated that the petitioner shot Baker about three or four times. Id. at p. 93, lines 17-24.

Felicia also testified that a document—Exhibit 64—said at the top, "Death before dishonor." Id. at p. 112, lines 10-20. She testified that she

recognized that saying because it was tattooed on the petitioner's (her nephew's) neck. Id. at lines 18-23. She testified that Exhibit 67 was a letter that was mailed to her from her nephew (the petitioner) and that at the top it said "Death before dishonor." Id. at p. 113, lines 11-24. Felicia testified that Exhibit 67A, the envelope, showed a return address from Fred McBride at 949 North 9th Street; Felicia testified that she did not know a Fred McBride and that the return address showed that the petitioner was at the Milwaukee County Jail, pod 58, cell 39. Id. at p. 114, lines 3-25. She also identified Exhibit 68 as a letter to her from the petitioner, and 68A as the envelope. Id. at p. 115, lines 3-21.

Dr. Wiewslawa Tlmoak, the deputy chief medical examiner of Milwaukee County, testified that the cause of Kenda Baker's death was homicide and described the locations of the various gunshot wounds on his body. Dkt. No. 24-27 at pp. 18, lines 20-25; 19-38, 39, lines 1-19. Detective Keith Kopcha of the Milwaukee Police Department testified that he took possession of and inventoried four bullets retrieved from Baker's body during the autopsy. Dkt. No. 24-26 at pp. 9, lines 20-25; 10-18; 19, line 1.

Lt. Thomas Casper of the Milwaukee Police Department testified that he was assigned to go to the house on Mineral Street to look for the petitioner. Dkt. No. 24-26 at pp. 42, lines 16-25; 43, lines 1-6. He testified that when he arrived, one African-American male (not the petitioner) was present. Id. at 43, lines 19-25; 44, lines 1-5, 19-21. Casper told the jury that the officers obtained a search warrant for the residence. Id. at p. 45, lines 4-20. The search revealed

12

documents related to the petitioner—a rent receipt, some Western Union receipts, a car repair receipt. Id. at p. 46, lines 7-24. Casper testified that in the basement, officers found ten-round pistol magazines for a .40-caliber, Glock, semi-automatic pistol. Id. at p. 47, lines 12-25. The magazines were secreted on top of a wooden I-beam. Id. at p. 49, lines 9-17. William Newhouse of the Wisconsin Department of Justice Crime Laboratory testified that all ten casings submitted to the lab for testing were fired from the same pistol. Dkt. No. 24-26 at 36, lines 1-10. He concluded that the gun that fired the bullets was a Glock-manufactured pistol. Id. at lines 11-23.

Detective Warren Spottek of the Milwaukee County Sheriff's Office testified that records showed that from August 10 through November 17, 2011, from November 21 to December 2, 2011 and from December 3, 2011 to January 29, 2012, the petitioner was housed in Pod 5A of the Criminal Justice Facility. Dkt. No. 24-27, at pp. 62, lines 22-25; 63-64; 65, lines 1-4. He testified that there were sixty-four cells in Pod 5A. Id. at p. 68, lines 4-6.

Finally, Milwaukee Police Officer Daniel Roufus testified. Dkt. Nos. 24-27 at pp. 69-81. Roufus testified that on January 28, 2012, he was on patrol with Officers Brian Maciejewski and Dan Vidmar. Id. at p. 70, lines 1-24. He testified that at around 4:29 p.m., the officers encountered a 2012 Chevrolet Impala in a gas station parking lot. Id. at p. 71, lines 7-15. The officers followed the vehicle when it left the gas station. Id. at pp. 72, lines 23-25; 73, line 1. Roufus testified that after following the car a few blocks, they pulled it over for a seatbelt violation and Officer Maciejewski made contact with the driver. Id. at

13

p. 73, lines 6-14. Roufus said that the driver of the car was Alvertis Kennedy, id. at p. 74, lines 22-23, the front passenger was Randy Johnson and the back seat passenger was Tony Oliver, id. at p. 75, lines 9-11. The officers removed the three from the car, id., lines 15-17, and Randy Johnson asked for his coat, which was in the trunk of the vehicle, id. at p. 76, lines 24-25. Roufus testified that Officer Vidmar retrieved the coat from the trunk. Id. at p. 77, lines 5-10. The officers then searched the coat. Id., lines 17-21. Roufus testified that folded within the coat was an opened letter; Roufus testified that he observed the letter. Id. at p. 78, lines 6-15. He said that the letter had a "partial name for the person who sent it in one corner and another name in the middle," and that it was from the House of Corrections. Id. at lines 16-20. Roufus told the jury that during the subsequent booking process, officers recovered from Randy Johnson a photo ID for the petitioner. Id. at p. 79, lines 3-14.

The prosecutor showed Roufus Exhibit 64. Id. at p. 79, line 25; 80, lines 1-2. Roufus identified the exhibit as a photocopy of the envelope that had been folded into Randy Johnson's coat. Id. at p. 80, lines 4-14. Roufus testified that Exhibit 64 contained a copy of the letter that was inside the envelope on the day the officers found it. Id. at lines 15-16. Roufus said he'd briefly looked at the original letter at the scene of the stop, and again at the police station. Id. at lines 17-25.

During a jury recess, the following exchange occurred:

THE COURT: . . . apparently the original of [Exhibit] 64 was somehow inadvertently destroyed. So we only have the copy. And I'm looking at Section 910.03 of the Wisconsin statutes and it says a duplicate is admissible to the same extent as an original unless, one,

14

a genuine question is raised as to the authenticity of the original, or, two, in the circumstances it would be unfair to admit the duplicate in lieu of the original.

\*\*\*\*\*

[PROSECUTOR]: Yes. And I did tell the Court earlier that the original was on inventory. It was placed on inventory. It—and I think yesterday the officers told me that they believed it had been destroyed. I wanted them to check it to make sure it was, but apparently it has been.

I don't have verification that it doesn't exist anymore, but based upon what they've told me, the problem is is that this stop—maybe—but I will say what I understand and I'm probably not going to say it well is that this was not inventoried under the homicide and—so homicide detectives were not advised or allowed to sign off on the destruction and apparently in terms of the inventories that are kept, they try and glean out things that need to be kept.

I'm surprised that this was done, but there's a couple—so that's—that's why. Some police officer, I don't know if it was one of the arresting officers here, my understanding is was one of the officers involved in this discrete part of this investigation, this stop, was asked by the property bureau of that was needed. He checked his records which indicated no charges had been filed regarding this letter and the items that were on that inventory, and therefore agreed or allowed it to be signed off on it to be destroyed.

I don't know the exact procedure. I'm just paraphrasing what I believe to be the case what I've been informed. So that's how I understand the destruction took place. No one on the homicide investigation including myself or any of the detectives were consulted. It was done. It was done. It has been done. I did not realize that until yesterday.

And I will just—before I forget, I will just finish my argument regarding that. I agree with the Court as to what the law is regarding it. A couple things involving that letter is that in the Officer Wichefski's report, which regards the stop. He has typed out a verbatim of the letter. I will just show it to the Court.

Id. at pp. 82, lines 12-20; 83-84; 85, line 1.

15

After discussion about why the court and defense counsel were only just finding out about the original being destroyed (the prosecutor said it had slipped his mind), the court released the parties for lunch. Id. at pp. 85-87. After lunch, the parties discussed the issue further, with a detective confirming that the original letter had been destroyed. Dkt. No. 24-28, pp. 3-8 (specifically, p. 8, lines 1-7). Defense counsel objected to the last-minute nature of the State's notification that the letter had been destroyed, the fact that there was more than one handwriting on the letter and the fact that it was too late for her to have a handwriting examination done. Id. at pp. 8, lines 9-25; 9; 10, lines 1-10. The court advised the parties that it needed to decide, "despite the fact that this is a photocopy, is there enough to authenticate that it really is what it purports to be or is there a genuine issue that it's authenticity should be questioned . . . ." Id. at p. 12, lines 20-24. After some discussion, the court concluded that there was enough additional evidence to authenticate Exhibit 64, and found that the "best evidence rule" did not preclude the letter's admission. Id. at pp. 12, lines 24-25; 13; 14, lines 1-15. Defense counsel moved for a mistrial, but assumed the court would deny it. Id. at p. 14, lines 16-21. The court confirmed that assumption, finding that there were no grounds for a mistrial. Id. at p. 17, lines 6-11.

When the jury returned, Roufus identified Exhibit 84 as a "typed exact replica" of the letter in Exhibit 64. Id. at p. 21, lines 13-25. With regard to Exhibit 64, Officer Roufus testified that the partial name, address and pod number in the upper, left-hand corner of the envelope was "JACQU," with

16

address 949, pod 5-A cell, Milwaukee, Wisconsin 53233. Id. at p. 23, line 12-23. He testified that the officers had tried to find out who was in that pod. Id. at p. 25, lines 8-14. Officer Roufus also testified that Officer Maciejewski wrote the police report that contained a typed-out version of the letter. Id. at p. 24, lines 15-24. Officer Roufus read Exhibit 84—the typed replica of the letter contained in the report—to the jury. Id. at pp. 27, lines 12-25; 28, lines 1-14:

> THE WITNESS: . . . The letter is entitled "Death before Dishonor. Wats good my nigga, me in here stressin' hard as hell, kinfold, I need you niggas to breath on muthfukas way before trial get her my nigga. O'l girl em was saying plenty of shit like they gone help tha police take me down on everything." Thanks.
>
> THE COURT:    I'm sorry, say that again, just the last line.
>
> THE WITNESS:    "Take me down on everything. My nigga I got kids out their my nigga do wat yall got to do, you see how they did lips" on the—and tha box. I don't want to be tha next. So I need you bro. It's plenty niggas beating they cases in here cause they niggas out their breathin on shit my nigga. Female or not do what you got to do"—"on the line. Aunte said she not testifying" We'll been—"We been writing each other for the past two months she said I will probably get out before her. Am a put o'l girlem address on the back of this letter bro I need you to get on dat asap. My nigga love bro."
>
> And then on the rear of the letter it said, "Tab and poo-poo mama address is 3001 W" for west, "Silver Spring," "D-R" for Drive and "Latia Wimpie," dash, "504 N" for North, "34" street or 2526 North 29 Street. "Get on it asap bro." Thank you.

Id.

Milwaukee police detective Steven Caballero testified to having conducted a search of Felicia Leichman's cell at the Milwaukee House of Correction, and to finding and taking Exhibits 67 (a letter), 67A (its envelope), 68 (another letter) and 68A (its envelope). Id. at pp. 31, lines 10-25; 32-33; 34, lines 1-21. He also testified to retrieving Exhibit 85, which was "different" from the other

17

two. Id. at pp. 34, lines 22-25; 35, lines 1-7. Milwaukee police detective Charles Mueller testified that the investigation had revealed that the address on silver Spring had been provided to the police by Tabitha Jones and Kelly Carson, and that Kelly Carson was "Poo-Poo" and Tabitha Jones was "Tab." Id. at pp. 37-40.

After the State had rested, the court raised with the parties—outside the hearing of the jury—that the petitioner had sent the court a letter. Id. at p. 41, lines 12-15. The petitioner provided that letter to the court in this federal *habeas* case; it was dated received on May 23, 2013, and reads:

> Judge I feel am not receivng a fair trial my lawyer has witnesses we suppose to call and without my permisson she's not calling my witnesses. At the beginning of trial I thought they were being called on my behalf and without consulting me she's not calling my witnesses. I have a right to a fair trial and that includes to have witnesses on my behalf My mother and Vincent Jaurzes are the witnesses I intend to call.
>
> Vincent Jaurez was a witness who was at the crime scene, in his statement made he describes the crime and the person who he scene did the crime. A photo-arry was conducted with my picture and he did not identify me as the shooter.
>
> He describes the shooter as Black male late 30s,-6'1-6'2 230 to 240 pounds, <u>light skin complexion</u>
>
> As you see am dark-skin, early 20s. This is the last chance I have to prove my innocence. My lawyer said the private investigator went to talk to Vincent he said if he seen the shooter he would know who he was. He did a photo-arry with the police and did not identify me. Theres no reason not to call witnesses.

Dkt. No. 27-1 at 7.

The prosecutor advised the court that Juarez had been on the State's witness list, but that the State had been unable to call him as a witness because the detectives could not locate him. Dkt. No. 24-28 at p. 51, lines 1-

18

21. The court observed that Juarez had been shown a photo array but could not identify the petitioner. Id. at lines 22-24. The parties talked about the risk that had Juarez come to court, he might have identified the petitioner as the shooter. Id. at pp. 51, line 25; 52, lines 1-9.

The jury found the petitioner guilty of first-degree intentional homicide. Dkt. No. 24-30 at pp. 3, lines 20-25; 4, lines 1-18. On July 12, 2013, Judge Ellen R. Brostrom imposed a life sentence with no opportunity for release on extended supervision. Dkt. No. 24-1 at 2.

### 3. *Postconviction Litigation*

#### a. November 3, 2014 post-conviction motion

On November 3, 2014, the petitioner filed a postconviction motion in Milwaukee County Circuit Court. Leichman, Case No. 2011CF2926. According to the trial court decision denying the motion, the petitioner raised three grounds in that motion:

> (1) the State violated the fourteenth amendment by "knowingly using false testimony" and engaging in prosecutorial misconduct during closing argument; (2) the court admitted hearsay evidence during closing argument and abused its discretion by allowing testimony from Tabith Jones concerning her latter version of events; and (3) trial counsel was ineffective for numerous reasons.

Dkt. No. 1-1 at 1.

Regarding the second ground (which relates to one of the petitioner's claims in this federal *habeas* petition), the trial court explained:

> The defendant next asserts that the trial was prejudiced by the admission of a latter sent to Randy Johnson because Randy Johnson never testified and the jurors heard that the defendant sent the letter to Johnson to intimidate the State's witnesses. He claims that the court erred by allowing admission of the unsubstantiated

19

letter. The court stands by its former ruling and finds no erroneous exercise of discretion. (Tr. 5/23/13, p.m., pp. 10-14) . . . .

Id. at 3. With regard to the third ground (which also relates to one of the petitioner's claims in this federal *habeas* petition), the trial court explained that the petitioner had alleged that his trial lawyer was ineffective because, among other things, she had failed "to call Vincent Juarez and Officer Vance Scollin for the defense after counsel had promised the jury that Juarez would testify" and because she had not called "Willa Leichman[2] and Marshall Smith after promising the jury they would testify as to alibi . . . ." Id. at 3-4. The trial court rejected this argument, as well. The court pointed out that the petitioner's lawyer had not promised to call Vincent Juarez, but had listed him as a potential witness "simply to ensure that if [he was] called, none of the jurors knew [him] or were friends with [him]." Id. at 4. More to the point the court explained that

> . . . Mr. Juarez would have tied the shooter to Felicia Leichman, whom he recognized on the street that night, because he saw the shooter come from the rear of the house that that person shared with Felicia Leichman. (*Criminal Complaint, p. 2*).

Id. at 4-5. As for Willa Leichman, the trial court again emphasized that defense counsel had not promised that she would testify (she'd been listed as a potential witness for the same reason as Vincent Juarez), and the court observed that "there is no showing what [Willa Leichman] would have said at trial." Id. at 5.

---

[2] Willa Leichman is the petitioner's mother. Dkt. No. 24-30 at pp. 13, line 6; 53, lines 14-19.

b.	Direct Appeal and Appeal of Denial of Postconviction Motion

The petitioner appealed his conviction and denial of his postconviction motion. Dkt. No. 24-2. The petitioner stated his first appellate issue this way: "was Trail [sic] Counsel ineffective for (A) failure to investigate or call alibi and disinterested witness's, and (B) failure to suppress items seized in [the petitioner's] home through permission by invalid third party consent." Id. at 3-4. Citing Wis. Stat. §§901.01 (authenticity) 910.02 (best evidence rule), the petitioner stated his second appellate issue: "Did the Circuit Court error in it's application of law to facts when admitting this letter, and testimony related to it's admission?" Id. at 4, 5.[3]

As for the ineffective assistance of counsel claims, the petitioner argued that his counsel was deficient for failing to investigate Victor Juarez's statement and failing to call Juarez as an eyewitness. Id. at 13-14. The petitioner argued that Juarez would have provided testimony contradicting the State witnesses' version of events. Id. at 15. He also argued that Juarez's testimony would have corroborated his aunt Felicia Leichman's testimony that the shooter came from the rear of the residence and that "a light complexion male with a gun came from the residence." Id.

The petitioner argued that trial counsel was ineffective because she should have investigated and called his mother, Willa Leichman, to testify as

---

[3] The petitioner raised a third appellate issue in his direct appeal that he has not raised in this federal *habeas* petition.

an alibi witness. Id. at 15-16. The petitioner contended that if his counsel had investigated or interviewed Willa, her testimony "may have corroborated [the petitioner's], that he was not around when the shooting took place." Id. at 16.

Regarding the inadmissible evidence claim, the petitioner argued that portions of Officer Roufus's testimony constituted inadmissible hearsay. Id. at 25. He asserted that Roufus admitted that Officer "Modchefski" had authored the report Roufus had read in court, so Roufus "testified to a report he did not author, stating what was allegedly said by Randy Johnson." Id. at 25. The petitioner asserted that the report itself had not been admitted into evidence. Id. The petitioner argued that Officer Roufus's reading of the report constituted inadmissible hearsay because Officer Roufus was not the author of the report. Id. The petitioner contended that under Supreme Court precedent, "if 'a police officer report recorded an objective fact' another police officer could not introduce the information on that report, 'such testimony would violate the confrontation clause.'" Id. (citing Bullcoming v. New Mexico, 564 U.S. 647 (2011)).

On August 30, 2016, the Wisconsin Court of Appeals affirmed the conviction and the circuit court's denial of the postconviction motion. Dkt. No. 1-1 at 16-32. The court began its discussion of the petitioner's ineffective-assistance-of-counsel claims by explaining that "It is within an attorney's discretion to call or not call a particular witness, if the circumstances of the case reasonably support such a decision." Id. at 19 (quoting State v. Wood, 323 Wis. 2d 321, 368 (Wis. 2010)). Referencing Wood, the appellate court said that

22

it generally would not second-guess a trial lawyer's "discretionary decisions at trial if the decisions were rational in light of the law and the facts of the case." Id.

Turning to Vincent Juarez, the court explained that Juarez was a witness to the shooting, and that the petitioner had argued that Juarez's description of the shooter would have cast doubt on whether the petitioner was the shooter. Id. The court explained how the petitioner had written to the trial court expressing concern about his defense lawyer's refusal to call Juarez, and about how defense counsel had expressed concern that if called to testify, Juarez might have—in open court—recognized the petitioner as the shooter. Id. at 19-20. It explained how Juarez had been on the State's witness list but how the State had been unable to find him, and about how Juarez could have connected the shooter to Felicia Leichman. Id. at 20. The court concluded:

> In denying the postconviction motion, the trial court noted that Juarez had recognized Felicia at the scene and saw the shooter coming from the rear of her home. The trial court thus accepted counsel's representation that she had made a reasoned decision against calling Juarez. We agree with this assessment. It is not ineffective to decline to call a witness who would likely be more helpful to the State. *See **State v. Eckert***, 203 Wis. 2d 497, 515 . . . (Ct. App. 1996).

Id.

As to counsel's alleged failure to call the petitioner's mother, Willa Leichman, the court observed that the petitioner's postconviction motion gave no details about her proposed testimony, asserting only that she could have provided an alibi. Id. at 20-21. The court explained that the petitioner faulted his trial lawyer for not conducting an investigation to find out these details. Id.

23

at 21. The court found, however, that it was the petitioner who had the burden to demonstrate prejudice from his lawyer's alleged failure to investigate. Id. (citing Washington v. Smith, 219 F.3d 620, 632 (7th Cir. 2000)). The court found that the petitioner had not met this burden: "if [this] witness[ ] [Willa Leichman] were to provide an alibi for [the petitioner] because they were together, then [the petitioner] himself should have some knowledge of how the witness[ ] would testify. We agree with the trial court that the claim of ineffective assistance for failure to investigate or call [this] witness[ ] is insufficiently pled." Id. (The court also observed, in a footnote, that in the State's response to the petitioner's postconviction motion, the State had said that the petitioner's trial lawyer had disclosed that she'd spoken with Willa Leichman and another witness, neither of whom told her anything helpful to the petitioner. Id. at n.4)

Regarding the admission of the contents of the letter the petitioner allegedly wrote to Randy Johnson, the court characterized the petitioner's postconviction motion as asserting that "there was insufficient foundation for this hearsay testimony." Id. at 23. The appellate court observed in a footnote that the trial court "correctly noted that a party's own statements are not hearsay," citing Wis. Stat. §908.01(4)(b)1. Id. at 23 n.8. It explained that on appeal,

> [the petitioner] asserts that the letter, recovered from Johnson's coat pocket[4] during a traffic stop, lacked foundation; specifically, he says

---

[4] The appellate court got this fact slightly wrong; the officers testified that the letter to Johnson was inside Johnson's folded jacket, not in the pocket.

that the trial court had said the letter would not be admitted unless Felicia recognized the handwriting, but she did not, so the trial court erred in allowing the letter to come in. [The petitioner] also complains it was error to allow admission of a photocopy instead of the original, and that Roufus's testimony about the letter's contents was inadmissible hearsay.

Id.

The appellate court rejected the petitioner's characterization of the trial court stating that the letter would be authenticated only if Felicia Leichman identified the handwriting. Id. at 24. It quoted the trial court, which said that Felicia's ability to recognize the letter's handwriting was a "fair part of the authentication chain," along with distinctive characteristics and the totality of the circumstances. Id. The trial court had talked about whether the State could put "all those links together." Id. The appellate court found that it was "clear that the trial court did not hold that the only means of authenticating the letter would be Felicia's identification of [the petitioner's] handwriting. Rather, the trial court was noting that it was the State's burden to provide the appropriate foundation for the letter." Id. at 25.

The court then walked through the evidence the State had presented to authenticate the letter:

The letter was recovered from Johnson, who lived with the Leichmans. Part of [the petitioner's] first name—"Jacqu"—was visible in the return address of the torn envelope. The visible portion of the return address matched [the petitioner's] jail pod location. Felicia testified that she recognized the handwriting as [the petitioner's] because she had received two letters from him while she was in the House of Correction. She then volunteered that she did not "know if he wrote the letters, but I do know the letters came from him to me." Felicia also admitted she was not certain if he had done the actual writing. However, she had recognized the letter's heading,

25

"death before dishonor," as words from a tattoo on [the petitioner's] neck.

Id.

The appellate court could find no error "in the trial court's determination that the document was properly authenticated; there were multiple grounds used to establish that the letter was what the State claimed it was." Id. at 25.

The petitioner also had appealed on the ground that because the original copy of the letter had been destroyed, the State had offered (and the trial court had admitted) a photocopy; the petitioner had complained that the authenticity was questionable because of unknown handwriting in the margins. Id. at 26. The appellate court recounted that the trial court had decided that issue based on the best evidence rule, which states that to prove the contents of a writing, the original is required unless a statute provides otherwise. Id. (citing Wis. Stat. §910.02). The Court of Appeals also pointed out that Wis. Stat. §910.03 provides that a copy is admissible to the same extent as an original unless there is a "genuine issue" as to the original's authenticity or the circumstances made it unfair to admit the original. Id. The appellate court found that

> [t]he trial court, though dismayed by the State's last minute revelation, concluded that the best evidence rule did not preclude use of the copy. The trial court noted that the additional handwriting was three mileage notations, clearly in someone else's handwriting.[5] Coupled with a contemporaneous police report that memorialized the contents of the original, the trial court concluded there was no bar to the duplicate under Wis. Stat. § 910.03, and any questions

---

[5] It is not clear to this court that the trial court found the handwriting to be someone else's. The judge *did* find that the notations were written with a different writing instrument than the rest of the letter—some with pen, some with pencil.

26

relating to the mystery writing were proper for cross-examination. We discern no erroneous exercise of discretion in this conclusion.

Id. at 26-27. In a footnote, the appellate court also observed that Wis. Stat. §910.04(1) states that an original isn't required, and "other evidence of the contents of a writing is admissible," if the originals were destroyed, as long as they were not destroyed in bad faith; the appellate court said, "No one suggests bad faith by the State." Id. at 27 n.9.

Finally, the appellate court addressed the petitioner's contention that Officer Roufus's testimony constituted hearsay, particularly because the State introduced the letter by having Roufus read the typed transcript of the letter from the police report. Id. at 27. The appellate court ruled:

> We conclude that if there is any error in allowing Roufus to read from someone else's report, it was harmless. *See **State v. Deadwiller***, . . . 350 Wis. 2d 138 . . . [168 (2013)]. We note that [the petitioner] has not challenged the accuracy of the transcription. Further, Roufus, who had viewed the original letter, identified the photocopy as a true and correct copy of the letter recovered from Johnson's pocket. To avoid any hearsay problem with reading from another officer's report, the State could simply have had Roufus read from the copy of the letter itself, which was not hearsay because it purportedly contained [the petitioner's] own statement. *See* Wis. Stat. § 908.01(4)(b)1.

Id.

The appellate court affirmed both the petitioner's conviction and the trial court's order denying his postconviction motion. Id. at 32. In a petition dated October 27, 2016, the petitioner sought review by the Wisconsin Supreme Court. Dkt. No. 24-6. On January 9, 2017, the Wisconsin Supreme Court denied the petitioner's petition for review. Dkt. Nos. 24-5, 24-8.

27

      c.      Second Motion for a New Trial

On February 23, 2017, the petitioner—representing himself—filed a second motion for a new trial, this one under Wis. Stat. §974.06 and based on newly-discovered evidence. Leichman, Case No. 2011CF2926. The trial court denied the motion days later, on February 27, 2017. Dkt. No. 1-1 at 11. The entirety of the court's order reads:

> On February 23, 2017, the defendant filed a second *pro se* motion for a new trial. His first motion for a new trial was filed on November 3, 2014 pursuant to sec. 809.30, Stats. and denied by the trial judge, Hon. Ellen R. Brostrom, on February 5, 2015. In it, one of the issues raised was an allegation that his attorney was ineffective for failing to call alibi witnesses Willa Leichman and Marshall Smith at trial. The case was assigned to this court as the successor to Judge Brostrom's homicide calendar.
>
> The defendant asserts that newly discovered evidence exists. Before a new trial may be awarded based on a claim of newly discovered evidence, the defendant must demonstrate (1) that new evidence was discovered after the trial; (2) that the defendant was not negligent in failing to discover the evidence before trial; (3) that the evidence is material; (4) that the evidence is not cumulative; and (5) that there exists a reasonable probability of a different result at a new trial. State v. Brunton, 203 Wis. 2d 195, 200 (Ct. App. 1996); State v. Coogan, 154 Wis. 2d 387, 394-95 (1990).
>
> The "new evidence" constitutes an unsworn, unnotarized statement from Willa Leichman[6] stating that the defendant did not leave her house after 8:00 p.m. on June 17, 2011 (the day of the shooting). Not only is this insufficient, it is not new. A statement may have been obtained after trial from Willa Leichman, but the information certainly wasn't discovered after trial. If this was the case, both he and Willa Leichman would have known this at the time

---

[6] The petitioner filed this letter as an exhibit in this federal *habeas* case. Dkt. No. 27-1 at 5. It is dated February 10, 2017 (years after both the homicide and the trial) and states that at 8:00 p.m. on June 17, 2011, the petitioner was at 7912 West Congress Apt. 2, was tired, was arguing with his kids' mother and did not leave Willa's house until 7:00 a.m. the next day. Id. Although it is signed and dated, the letter is not sworn or notarized.

of trial. The defendant has not met the newly discovered evidence standard for purposes of either obtaining a hearing *or* new trial.

Id. The trial court denied the petitioner's motion. Id.

The petitioner appealed. Dkt. No. 24-9. He identified two issues: "Did the trial court error by denying the defendant's motion for a new trial based on newly discovered evidence?" and "Was Trial Counsel ineffective for its failure to obtain Willa Leichman's statement before trial?" Id. at 3.

On April 13, 2018, the court of appeals affirmed the circuit court's denial. Dkt. No. 24-12. In pertinent part, the appellate court's order reads:

> [The petitioner] asserts that Willa's statement is newly discovered evidence because this is the first statement obtained from her and it was impossible for him to now what she would have said prior to obtaining the statement. Like the circuit court, we disagree. Willa's statement accompanying [the petitioner's] motion claims that on the night of the shooting, [the petitioner] was at 7912 West Congress, Apartment 2, from 8:00 p.m. until 7:00 a.m. the next morning. While there, [the petitioner] argued on the phone with his children's mother. [The petitioner] certainly should have been able to inform his counsel of his location, the time he was there, and any notable activities. He also should have been able to reasonably anticipate that his alibi witness would have the same or similar information. As best we can tell, [the petitioner] only ever claimed that Willa would provide him with an alibi; he never provided any details of what that alibi entailed. We therefore agree with the circuit court: while Willa's statement may have been discovered after trial, the information therein is not new, so the evidence is not newly discovered.
>
> [The petitioner] also claims his trial attorney was ineffective for failing to obtain Willa's statement. [The petitioner] has already litigated trial counsel's ineffectiveness relative to Willa as a possible alibi witness. "A matter once litigated may not be relitigated in a subsequent postconviction proceeding no matter how artfully the defendant may rephrase the issue." *See **State v. Witkowski**,* 163 Wis. 2d 985, 990 . . . (Ct. App. 1991).
>
> Additionally, in his reply brief, [the petitioner] asks us to apply our power of discretionary reversal under Wis. Stat. § 752.35 (2015-

29

16) to grant him a new trial in the interest of justice based on the ineffectiveness of his trial counsel. Discretionary reversal under § 752.35 is to be used only in exceptional cases. *See **State v. McKellips**,* . . . 369 Wis. 2d 437, [474 (Wis. 2016)] . . . We are not persuaded this is an exceptional case. Further, we typically do not consider arguments made for the first time in the reply brief. *See **Northwest Wholesale Lumber, Inc. v. Anderson**,* 191 Wis. 2d 278, 294 n.11 . . . (Ct. App. 1995).

Id. at 3-4.[7]

The appellate court affirmed the trial court's order denying the motion for a new trial. Id. at 4. The petitioner filed a petition for review in the Wisconsin Supreme Court, dkt. no. 24-13, which that court denied on July 10, 2018, dkt. no. 24-15.

> d.      Third Motion for a New Trial

On August 1, 2019, the petitioner filed his third motion for a new trial. Leichman, Case No. 2011CF2926. On August 21, 2019, the court denied that motion. (Neither party provided this federal court with that order.) The petitioner appealed. Dkt. No. 24-16. In his appellate brief, he identified the following issue: "Did the Circuit Court erroneously apply McCallum when it: (1) failed to evaluate Robert Brendt's credibility when deciding [the petitioner's] motion for a new trial, and (2) it stated that [the petitioner] would have to erase

---

[7] In footnotes, the appellate court also explained that the trial court had allowed the petitioner to obtain a sworn and notarized statement from Willa; that statement said that the petitioner had been at 7903 (not 7912) West Congress until 8:00 a.m. (not 7:00 a.m.) and that she cooked chicken for the petitioner while he was there. Dkt. No. 24-12 at 3 n.1. The court further explained that it was "not persuaded that [the petitioner] 'was not negligent' in seeking" Willa's sworn statement. Id. at n.2.

30

ALL of the State's evidence before a jury would accept Mr. Brendt's affidavit."

Id. at 4. As for the relevant facts, he stated:

> **Robert Brent,**made a affidavit on March 26, 2019, stating:On Wednesday, March 20, 2019,at 8:15am recreation period,at Greenbay Correctional Institution.(App. 1)Mr. Brendt participated in a conversation with [the petitioner] talking about females they knew in the pass.Mr. Brendt said he mentioned a women he visited named lauren who lived on 21st&National in Milwaukee,on June 17, 2011.He said that at 11-pm,he and Lauren went for a walk to visit Lauren's friend Larry who stayed on the corner of 18th&National.Mr. Brendt stated that before he and Lauren reached the corner of their destination he heard gun shots,and flashes of light in a small crowd of people across the street.He said 10-15 seconds later he saw a man running towards them with a gun in his hand.He described the suspect as being 6'1 to 6'2, "light complexion"with a low hair cut,28-35yrs old.Mr. Brendt said the suspect looked nothing like [the petitioner],and would testify to such.

Id. at 7 (as in original).[8]

Later in the brief, the petitioner asserted that in his motion for a new trial (which he has not provided to this court), "he argued and submitted a report made by peter Perales, private investigator,dated June 13, 2014,a year after [the petitioner's] trial.Where Felicia admitted to him that her trial testimony that [the petitioner] did the shooting was false altogether.([The petitioner's] motion for a new trial, pg. 5;App.3-4)[.]" Id. at 12 (as in original). The petitioner claimed the investigator had written that he'd spoken to Felicia Leichman on the phone and asked her if she'd been pressured by police to lie on the stand and implicate the petitioner; the investigator stated that she'd answered "yes." Id. The petitioner also asserted that "Felicia also made her own

---

[8] The petitioner provided the court with Mr. Berndt's affidavit in this federal *habeas* case. Dkt. No. 27-1 at 6.

31

affidavit dated March 3, 2014,a year after [the petitioner's] trial,admitting her trial testimony was false as well.(App. 22)" Id. (as in original). The petitioner asserted that had the jury had this information, "[t]hey probably would've considered delivering a different out come in the verdict." Id. at 13. He argued that this "new evidence" should have been considered by the trial court in ruling on his third motion for a new trial. Id.

On September 3, 2019, the petitioner appealed. State v. Leichman, Milwaukee County Case No. 2019AP1666 (available at https://wscca.wicourts.gov/). On December 29, 2020, the Court of Appeals summarily affirmed the circuit court's denial of the third new trial motion. Dkt. No. 24-19. The appellate court described the petitioner's arguments this way:

> [The petitioner] . . . filed the *pro se* motion underlying this appeal, arguing again that newly discovered evidence warranted a new trial. [The petitioner's] motion alleged that a fellow inmate, Robert Berndt, told [the petitioner] that he was near the scene of the shooting when Baker was killed. [The petitioner's] motion included an affidavit from Berndt stating that on the evening Baker was killed, Berndt and his girlfriend were walking in the vicinity of the shooting when they "heard gunshots and saw flashes of light in a small crowd of people across the street." The affidavit further states that a tall man with a light complexion, low haircut, and back t-shirt ran past them "with a gun in his hand." The affidavit further states that Berndt and his girlfriend then left the scene. [The petitioner's] motion argued that Berndt's affidavit was newly discovered evidence calling into question the identity of the shooter because Berndt's description of the shooter did not match [the petitioner's] physical characteristics.

Id. at 3.

The court of appeals—as it had done when reviewing the denial of the petitioner's second new trial motion—recounted the standard for granting a new trial based on newly-discovered evidence: the evidence must have been

discovered after conviction, the defendant must not have been negligent in seeking the evidence, the evidence must be material to an issue in the case, the evidence cannot be merely cumulative and there must be a reasonable probability that a different result would have been reached at trial. Id. at 3-4 (citing State v. McCallum, 208 Wis. 2d 463, 473 (Wis. 1977)). The appellate court explained that there is a reasonable probability of a different outcome if "there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt." Id. (quoting State v. Love, 284 Wis. 2d 111, 134 (Wis. 2005)).

The court then reasoned:

> Here, the postconviction court assumed that Berndt's affidavit met the first four criteria, but determined that there would not be a reasonable probability of a different outcome if the jury heard the newly discovered evidence. We agree with the postconviction court that Berndt's affidavit does not undermine the abundance of trial evidence. The postconviction court chronicled the litany of evidence presented at trial, including, but not limited to, the fact that multiple witnesses identified [the petitioner] as the shooter. Officer Daniel Roufus testified that he stopped a vehicle drive by a man who had lived with [the petitioner] and Felicia and found a letter written by [the petitioner] in the man's pocket. The letter stated that Felicia would not be testifying and it provided the addresses of two other women who witnessed the shooting, asking the recipient "to get on dat asap." The letter further stated, "[f]emale or not do wat you got to do." The postconviction court also noted that police recovered a pistol magazine for a .40 caliber Glock semi-automatic pistol at [the petitioner's] residence. Trial testimony suggested that Baker was shot with a .40 Glock manufactured pistol. Based on this evidence, the postconviction court found that the trial evidence was "simply overwhelming" and noted that "there are no facts set forth in the affidavit which would effectively obliterate all of the evidence that was presented at trial."
>
> Contrary to [the petitioner's] assertion, the postconviction court applied the appropriate standard when rendering its decision. In chronicling the trial evidence and evaluating Berndt's affidavit,

33

the postconviction court appropriately determined that Berndt's affidavit did nothing to undermine the evidence presented at trial. Indeed, Berndt's affidavit does not even claim that he witnessed the shooting. He simply states that he was near the scene, heard gun shots, and saw someone other than [the petitioner] run past him.

We also disagree with [the petitioner's] assertion that the postconviction court was required to hold an evidentiary hearing to determine the credibility of Berndt's affidavit. The postconviction court assumed the affidavit *was* credible and trustworthy, but nonetheless determined that it was insufficient to create a reasonable probability of a different outcome.

Id. at 4-5.

In a footnote, the appellate court explained that the petitioner's appellate brief also

raises additional, undeveloped arguments . . . [The petitioner] asserts that the postconviction court should have considered the evidence that he presented with his prior motions for a new trial. Specifically, he points to an email from an investigator who told him that in 2014 he contacted Felicia, who told him that she had been pressured to lie on the stand and implicate [the petitioner]. This argument is undeveloped and we do not address it further. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47 . . . (Ct. App. 1992) (we do not consider undeveloped arguments on appeal).

In [the petitioner's] appendix to his brief-in-chief, he also mentions a 2014 affidavit from Felicia in which she said that "lil Ron," not [the petitioner], was the shooter. The postconviction court did not consider Felicia's affidavit because [the petitioner] did not present the affidavit to the court in his motion for postconviction relief. Accordingly, we also do not consider the affidavit.

Id. at 5, n.3.

According to the publicly available docket, the petitioner did not petition the Wisconsin Supreme Court for review of that ruling. See Leichman, Case No. 2019AP1666.

## B.    Federal *Habeas* Petition

On December 7, 2018—five months after the Wisconsin Supreme Court denied his petition for review of the denial of his second motion for a new trial, and eight months *before* the petitioner filed his third motion for a new trial—the petitioner filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging the homicide conviction. Dkt. No. 1. The court did not immediately screen the petition, and nineteen months later, in July 2020 (ten months after the court of appeals affirmed the denial of his third motion for a new trial), the petitioner filed a "Motion to File Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Sec. 2254, and to Stay the Proceeding, and hold Amended petition in Abeyance until Wisconsin State Courts decide petitioner's claim." Dkt. No. 15. The court granted the motion and stayed the case until the petitioner could exhaust his state court remedies. Dkt. No. 16. In February 2021, seven months after seeking the stay, the petitioner filed a motion to reopen his case. Dkt. No. 17. In March 2021, the court granted that motion and ordered that the amended petition the petitioner had proposed months earlier, dkt. no. 15-1, was the operative petition. Dkt. No. 18. The court found that the petitioner's state conviction had become final on January 28, 2021. Dkt. No. 18 at 3. It observed, however, that in the motion to reopen, the petitioner had said that he planned to pursue in federal court only exhausted claims; the court inferred that the petitioner believed he had not exhausted all his claims. Id. at 4. Accordingly, at the end of its order, the court ordered that by April 9, 2021, the petitioner must inform the court as to which claims in his

35

amended petition he did not wish to pursue. Id. at 5. The petitioner did not

identify any claims he did not wish to pursue, so on March 9, 2021, the clerk's

office docketed the proposed amended petition (Dkt. No. 15-1) as the operative

petition. Dkt. No. 19.

The amended petition raises three grounds for relief. Ground One

asserts:

> The trial court's admission of Officer Maciejewski's report into evidence through the trial testimony of Officer Roufus was hearsay barred by the federal rules of evidence and the 6th Amendment Confrontational Clause.
>
> ********
>
> Officer Roufus trial testimony was testimonial hearsay, in which the trial court allowed him to read the contents of Maciejewski's report into evidence which contained the contents of a letter supposedly written by the petitioner to Randy Johnson.

Dkt. No. 19 at 6-7.

> Ground Two states:
>
> Trial counsel was ineffective during pretrial and trial for failure to conduct a pre-trial investigation and call one eyewitness, and petitioner's alibi witness to testify at trial.
>
> *******
>
> Trial Counsel failed to conduct an adequate pre-trial investigation related to Vincent Juraez (eyewitness), and Willa Leichman (alibi witness) before deciding not to call each on petitioner's behalf during trial.

Id. at 7.

Ground Three raises a two-part due process claim based on new

evidence of actual innocence. Id. at 8. It asserts:

> Violation and denial of petitioners due process due to new evidence of actual innocence.
>
> *******
>
> 1. Felicia Leichman (Caldwell) admitted that she lied during her trial testimony that petitioner did crime in a affidavit wrote after petitioner's trial dated: 3·4·2014.
> 2. Peter Perales, a private investigator, made a report admitted that he talked to Felicia Leichman (Caldwell) on the phone, and she admitted to him that she lied at trial that petitioner was the suspect, dated: 6·13·2014.
> 3. Robert Berndt, a inmate at Greenbay Correction Institution, made a affidavit stating that he was at the crime when the shooting happen. He stated that petitioner isn't the suspect he seen do the shooting.

Id. at 8.

On May 19, 2021, the respondent answered the petition and provided portions of the record. Dkt. Nos. 24; 24-1 through 24-31. On June 15, 2021, the petitioner filed his brief in support of his petition. Dkt. No. 27. On September 30, 2021, the respondent filed a brief in opposition, arguing that the court should dismiss the petition. Dkt. No. 41. The petitioner filed a reply in support of the amended petition. Dkt. No. 42. The motion has been fully briefed for an extensive period; the delay is entirely attributable to the court.

## II.    The Parties' Arguments

### A.    The Respondent's Answer (Dkt. No. 24)

In response to the petitioner's argument that the trial court erroneously admitted hearsay that violated his Confrontation Clause right, the respondent saids that (a) the hearsay issue is an issue of state law not cognizable on federal *habeas* proceedings, and (b) the petitioner had procedurally defaulted on the Confrontation Clause portion of the argument because he had not fairly

37

presented it as a federal constitutional issue in state court. Dkt. No. 24 at ¶5. The respondent also asserted that the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of federal law, and that it was not based on an unreasonable interpretation of the facts. Id. Regarding the petitioner's claim that his trial counsel was ineffective, the respondent again asserted that the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of federal law, and that it was not based on an unreasonable interpretation of the facts. Id. at ¶6. The respondent asserted that the petitioner's claim that Felicia and Berndt's affidavits constituted newly discovered evidence showing actual innocence is not cognizable in federal *habeas* proceedings, is barred by the AEDPA limitation period and did not relate back to the claims in the original petition and had been procedurally defaulted. Id. at ¶7. The respondent also asserted that the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of federal law, and that it was not based on an unreasonable interpretation of the facts. Id. The respondent admitted that the petitioner had exhausted his remedies for any claims that he'd not procedurally defaulted. Id. at ¶8.

B.   The Petitioner's Brief in Support of the Amended Petition (Dkt. No. 27)

Regarding his hearsay claim, the petitioner argued that he'd fairly presented the Confrontation Clause aspect of the claim because in his state brief, he'd argued that Roufus's testimony was hearsay because Roufus wasn't the author of the letter and asserted that his testimony would violate the Confrontation Clause, citing the Supreme Court case of Bullcoming, 564 U.S.

38

647. Id. at 4-5. He argued, citing several cases, that Roufus's reading of Maciejewski's report "was testimonial hearsay." Id. at 5-6. He asserted that his attorney had objected to Roufus reading Maciejewski's report on the ground of hearsay. Id. at 6. The petitioner said that he didn't have the opportunity to question Maciejewski, who was deemed unavailable. Id. at 6-7. The petitioner asserted that his lawyer was not able to question Roufus on the different handwriting in the letter and the fact that the original letter had been destroyed. Id. at 7. He asserted that "Roufus read Maciejewski's report as if it was the letter itself," but the petitioner characterizes the report as the sworn statement of a witness who the prosecutor didn't call at trial; the petitioner said this violated the Sixth and Fourteenth Amendments. Id. at 8. He ended by reiterating that Maciejewski's out-of-court declarations were hearsay. Id.

The petitioner also argued that the appellate court's harmless error analysis was an unreasonable application of Chapman v. California, 386 U.S. 18 (1967). Id. at 8-9. He asserted that the appellate court's conclusion that Roufus's reading from someone else's report was harmless error "was different than the harmless error test under clearly established U.S. Supreme Court law," which he stated was "what effect the error had or reasonably may be taken to have on the jury's decision." Id. at 10 (citing Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). He asserted that the court's conclusion that the prosecution could have just had Roufus read the copy of the original letter ignored the fact that doing so would have opened the door for the defense to challenge the authenticity of the original letter. Id. at 10. The petitioner

39

argued that the prosecutor referenced the letter in closing, that the jury asked to see the report and that shortly after it was provided, the jury came back with its verdict. Id. at 11-12. The petitioner said this shows that the error could not have been harmless. Id.

Arguing ineffective assistance, the petitioner reminded the court that on direct appeal, he'd asserted that his lawyer was ineffective when she failed to investigate and call Juarez and Willa Leichman. Id. at 13. He asserted that his lawyer based her decision not to call Juarez on the prosecution's investigation, rather than her own. Id. at 15. He asserted that Strickland v. Washington demanded that his lawyer conduct her own investigation. Id. (citing Campbell v. Reardon, 780 F.3d 752, 758 (7th Cir. 2015). Id. The petitioner asserted that "[i]f Mr. Juarez would've testified that [the petitioner] didn't match the description of the suspect he seen do the shooting, surely it would've been helpful for the defense." Id. at 15-16.

As for counsel's failure to call Willa Leichman, the petitioner asserted that "[t]he Wisconsin Court of Appeals agrees that [the petitioner's] trial attorney was ineffective for its failure to investigate, but ruled that [the petitioner] did not prove he was prejudice mainly cause he failed to secure Willa's statement himself." Id. at 16 (citing "Direct Appeal decision, pgs 5-6). The petitioner said that after his conviction was affirmed, he filed a motion for a new trial and attached an affidavit from Willa "confirming he was with her at the time of the crime." Id. at 16-17. He asserted that "[f]ailure to pursue an alibi defense by investigating alibi witnesses and calling them to testify

40

constitute deficient performance," citing <u>Washington v. Smith</u>, 219 F.3d 620, 631-32 (7th Cir. 2000). <u>Id.</u> at 17. Citing a police report, the petitioner claimed that on August 4, 2011, Willa told police that at the time of the shooting the petitioner was at her home and that she would be an alibi for him. <u>Id.</u> He also cited an affidavit from Willa, and he claimed that Willa was introduced by his lawyer as a possible witness. <u>Id.</u> He asserted that if he, himself, was able to obtain a statement from Willa "in prison, post trial," his lawyer "was more than capable of finding out the details of [the petitioner's] whereabouts at the time the shooting took place, pre-trial." <u>Id.</u> at 18. He said that his lawyer never produced any proof that she tried to interview Willa, even when she knew that the petitioner had told police that he was with Willa at the time of the shooting. <u>Id.</u>

The petitioner argued that he was prejudiced by trial counsel's failures to call Juarez and Willa because they could have "refuted some, if not all, the State witnesses version of events." <u>Id.</u> at 19. He criticized the fact that his lawyer told the jurors during jury selection that Juarez and Willa were "possible" witnesses but then didn't call them; he speculated that the jurors might have thought that the two did not want to testify. <u>Id.</u> He went further, asserting that his lawyer's failure to call "a single witness" on his behalf "may have gave the jury the impression that the State's case was unrefutable." <u>Id.</u> at 20. The petitioner then pointed out weaknesses in the testimony of other witnesses—prior convictions, contradictory testimony, changing statements— and he asserts that if Juarez and Willa had testified, their testimony might

41

have created reasonable doubt in the minds of the jury. Id. He asserted that he never had a chance to present a defense that would have corroborated what he told police—that he wasn't "around" during the shooting. Id.

Regarding actual innocence, the petitioner argued that a year after testifying at trial that the petitioner had shot Kenda Baker, Felicia Leichman wrote an affidavit stating that her trial testimony was false. Id. at 21. The petitioner said that if Felicia had testified to this at trial, there is no way the jury would have found him guilty beyond a reasonable doubt. Id. 22. He said that he understood that the court might have to hold an evidentiary hearing. Id.

The petitioner said that he'd attached to his amended *habeas* petition the private investigator's report saying that Felicia had told the investigator that she'd falsely implicated the petitioner at trial. Id. at 22-23. He asserted that this report corroborated that he was denied a fair trial by Felicia's allegedly false testimony. Id. at 23. He argued that the respondent had waived any objection to this argument by failing to raise it in the answer. Id.

C.      Respondent's Opposition Brief (Dkt. No. 41)

The respondent argued that to the extent that the petitioner is raising a hearsay claim in this federal *habeas* case, that claim is a state-court claim that is not cognizable on federal *habeas* review. Dkt. No. 41 at 11. As for the Confrontation Clause component of the petitioner's first claim, the respondent argued that the petitioner had procedurally defaulted on that claim by failing to present it through one full round of state-court review. Id. at 12. The

42

respondent argued that the petitioner did not make a Confrontation Clause claim before the trial court. Id. at 12-15. He asserted that the petitioner had not raised a Confrontation Clause claim in his first post-conviction motion or on direct appeal. Id. at 15-18. As for the petitioner's assertion that his single reference to Bullcoming and the Confrontation Clause constituted fair presentment, the respondent argued that that reference was insufficient to put either the State or the appellate court on notice that the petitioner was making a constitutional claim. Id.

Regarding the appellate court's harmless error analysis of what the Court of Appeals perceived as a hearsay argument, the respondent disputed the petitioner's argument that the photocopy was not a reliable alternative source from which Roufus could read. Id. at 20. The respondent emphasized that the parties had agreed to redact the handwritten notations, that the court had ruled that the photocopy had been adequately authenticated and that the jury would have heard the contents regardless of the source. Id. at 20-21.

In arguing that the appellate court had reasonably applied Strickland, the respondent asserted that the petitioner's trial counsel was not ineffective in failing to investigate or call Juarez as a witness. Id. at 22. He reiterated the risk in calling Juarez—the fact that Juarez could have identified the petitioner as the shooter and had recognized the shooter as being connected to Felicia. Id. at 22-23. He pointed out that Juarez's judgment on skin tone was subjective, and emphasized that defense counsel had recognized that if called, Juarez could have said some things that might have harmed the petitioner's case. Id. at 24.

43

Regarding counsel's failure to call Willa, the respondent argued that the petitioner had procedurally defaulted on that claim because the state courts had decided it on an independent and adequate state-law ground. Id. at 24-25. He recounted that the trial court concluded that the claim was insufficiently pleaded in the postconviction motion, and that the court of appeals had agreed. Id. at 25. The respondent also pointed out that the petitioner's attempt to buttress his argument with the claims he made in his second postconviction motion were unavailing because the appellate court rejected the petitioner's attempt to litigate that claim for a second time. Id. at 27.

Observing that the petitioner had tried to overcome procedural default by arguing actual innocence, the respondent argued that recantations of testimony are not sufficient, and argued that Felicia's recantation was not trustworthy. Id. at 29. He pointed out that the jury chose to believe Felicia's trial testimony, not the version she originally gave to police. Id. at 29-30. Regarding the petitioner's claims about the private investigator, the respondent pointed out that the investigator's report reflected that Felicia agreed to meet with the investigator but never did and did not return his follow-up calls. Id. at 30. And, with regard to Willa's statement, the respondent argued that the petitioner cannot succeed on a failure-to-investigate claim, because Willa's statement to the investigator was not sworn, not notarized, lacked an oath and did not say she was willing to testify. Id. at 31. He asserted that the petitioner has never explained what he did to notify his lawyer that he had an alibi, or to notify counsel that Willa could provide it. Id. at 32. And he asserted that the

44

petitioner could not show prejudice, because the other evidence against the petitioner was strong and the alibi evidence was weak. Id. at 32-33.

As for the petitioner's due process actual innocence argument, the respondent asserted that it is not cognizable in a federal *habeas* proceeding. Id. at 34. He asserted that the petitioner has not explained, either in his §974.06 new trial motion or in this case, what process he was denied. Id. at 35. He also argued that the petitioner's actual innocence claim was untimely, because the petitioner did not assert it within the one-year limitation period specified by 28 U.S.C. §2244(d)(1). Id. at 36. Observing that the one-year clock started on July 11, 2018, the respondent argued that it had expired on July 11, 2019, but that the petitioner had filed his third new trial motion in August 2019 and his amended federal *habeas* petition in July 2020. Id. at 36-37. The respondent argued that the actual innocence claim did not "relate back" to the claims in the original petition. Id. at 37. And the respondent argued that the petitioner had procedurally defaulted on the actual innocence claim, first because the petitioner had not petitioned the Wisconsin Supreme Court for review of the claim and second because the state appellate court decided it on independent and adequate state grounds (as undeveloped). Id. at 40-41. The respondent asserted that equitable tolling is not warranted because the "new" evidence did not prove actual innocence. Id. at 41-43.

D.     The Petitioner's Reply Brief (Dkt. No. 42)

Finally, the petitioner filed a reply brief in support of his petition. Dkt. No. 42. The petitioner took issue with the respondent citing state instead of

45

federal precedent. Id. at 4. He asserted that the respondent had misstated the fair presentment standard. Id. at 5. He argued that the state court *had* understood him to be making a Confrontation Clause argument, as demonstrated by the fact that it cited a Confrontation Clause case. Id. He argued that Roufus's reading of the letter through another officer's report was not harmless error because the photocopy of the letter taken from Randy Johnson was not readable, implying that without the version of the letter in Maciejewski's report, the jury could not have heard the contents of the letter. Id. at 6. He reiterated that his lawyer had not investigated Victor Juarez herself and that she'd mentioned him to the jury. Id. at 7-8. He reiterated that the respondent had waived any procedural default argument as to Willa Leichman because it had not raised it in its answer. Id. at 8-9. He asserted that procedural default is an affirmative defense that must be raised to be preserved. Id. at 9. The petitioner argued that the state court did not decide his ineffective assistance claim on an independent and adequate state ground because the court intertwined that ground with its merits analysis. Id. at 10. He argued that he was prejudiced by the state court's decision because both Juarez and Willa would have helped his defense; although he admitted that they were not "perfect" witnesses, he asserted that the State's witnesses weren't perfect, either. Id. at 11. He reiterated that his lawyer did not interview or call a single witness for his defense. Id. Finally, the petitioner asked that if this court does not agree that *habeas* relief is appropriate, it grant him a certificate of appealability. Id. at 12.

## III.  Analysis

### A.  The Law Governing Federal *Habeas* Petitions

Under the Anti-Effective Death Penalty Act (AEDPA), 28 U.S.C. §2254, a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). Indeed, "[t]he 'unreasonable application' clause requires the state court decision to be *more* than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on

47

the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" <u>Saxon v. Lashbrook</u>, 873 F.3d 982, 987 (7th Cir. 2017) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)).

Under AEDPA, a person incarcerated under the judgment of a state court must exhaust available state-court remedies before a district court may consider the merits of a constitutional claim in a federal habeas petition. 28 U.S.C. §2254(b)(1)(A). The exhaustion requirement gives the state court an opportunity to consider and correct alleged violations of the federal rights of persons who are incarcerated by the state. <u>Bolton v. Akpore</u>, 730 F.3d 685, 694 (7th Cir. 2013). To exhaust his claims, "[a] petitioner must raise his constitutional claims in state court 'to alert fairly the state court to the federal nature of the claim and to permit that court to adjudicate squarely that federal issue.'" <u>Weddington v. Zatecky</u>, 721 F.3d 456, 465 (7th Cir. 2013) (quoting <u>Villanueva v. Anglin</u>, 719 F.3d 769, 775 (7th Cir. 2013)). To comply with this requirement, the incarcerated person must "fairly present" the claim in each appropriate state court. <u>Bolton</u>, 730 F.3d at 694-95. "The failure to present fairly each habeas claim in state court 'leads to a default of the claim[s] and bar[s] the federal court from reviewing the claim[s'] merits.'" <u>Weddington</u>, 721 F.3d at 456 (quoting <u>Smith v. McKee</u>, 598 F.3d 374, 382 (7th Cir. 2010)). The courts call this circumstance "procedural default."

48

After a defendant is convicted in a Wisconsin state court, Wisconsin criminal procedure requires the defendant to "file a motion for postconviction relief [under Wis. Stat. § 974.02] . . . before a notice of appeal is filed unless the grounds for seeking relief are sufficiency of the evidence or issues previously raised." Wis. Stat. §809.30(2)(h). "If an issue is raised in the § 974.02 motion but relief is denied by the trial court, the defendant may then appeal to the Court of Appeals of Wisconsin." Page v. Frank, 343 F.3d 901, 906 (7th Cir. 2003).

B.      Hearsay/Confrontation Clause Claim (Ground One)

The petitioner's first ground for *habeas* relief asserts that the trial court's admission of Officer Maciejewski's report into evidence through Officer Roufus's testimony was hearsay, which the petitioner asserts was barred by the "federal rules of evidence" and by the Confrontation Clause of the Sixth Amendment.

1.      *Hearsay Claim*

The court observes that during the trial, the defendant's attorney did not object to admission of the letter on *hearsay* grounds. She objected on other grounds—lack of authenticity, late notice, her inability to have handwriting analysis conducted. But she did not object on hearsay grounds. The *petitioner* has objected on hearsay grounds in his post-conviction motions. But regardless of who raised the objection or when, the petitioner is not entitled to federal *habeas* relief on this issue.

The petitioner says that the content of the letter was barred by the "federal rules of evidence." But the Federal Rules of Evidence do not apply in

49

*state* court, where the petitioner's trial took place. In state court, the *Wisconsin* rules of evidence apply. Under Wisconsin law, "hearsay" "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Wis. Stat. §908.01(3). But the rule goes on to say that a statement is *not* hearsay if it is "offered against a party and is . . . [t]he party's own statement . . . ." Wis. Stat. §908.01(4)(b)(1). This is sometimes called the "admission of a party-opponent" rule. And this rule could be the reason that the petitioner's lawyer did not object to the content of the letter on hearsay grounds. Under this rule, if the *State*—the petitioner's "party opponent" in the criminal case—sought to admit the petitioner's own words against him, the petitioner's words would not qualify as "hearsay" under the Wisconsin hearsay rule. That is exactly what happened in the trial—the State, through Officer Roufus, sought to admit the content of the petitioner's letter to Randy Johnson against the petitioner (the State's opponent). In that circumstance, the petitioner's words to Randy Johnson did not constitute hearsay.

The petitioner implies that the words that were read to the jury were Maciejewski's words, because Maciejewski wrote the report that contained those words. But the trial testimony established that Maciejewski had copied the words from the letter officers had found in Johnson's coat. The trial court also found that the State had "authenticated" the letter by presenting evidence showing that the letter was written by the plaintiff. The State presented evidence that Felicia Leichman recognized the handwriting (and the "death

50

before dishonor" expression) as the petitioner's, that the return address on the envelope was the petitioner's cell placement while in custody, that the context of the letter (referring to people who'd witnessed the shooting) connected it with the petitioner, that the letter was found in the coat of someone who lived in the same residence as the petitioner's aunt Felicia. So the State proved that the letter taken from Randy Johnson was written by the petitioner, and that the words in Maciejewski's report were copied from that letter. Roufus also recognized the words as being from the letter, having seen the original letter at the scene and later at the station. Again, the petitioner's words—introduced by the State against him—did not constitute hearsay.

Even if the excerpt of the letter Roufus read to the jury *had* constituted hearsay, the petitioner has not proven that it was not admissible under one of the many exceptions to Wisconsin's hearsay rule. Wis. Stat. §908.03 lists twenty-four exceptions to the hearsay rule. The petitioner could not demonstrate that the trial judge erroneously admitted hearsay unless he demonstrates that the excerpt of the letter did not fall under one of those exceptions. He has not done so.

Finally, even if the excerpt had constituted hearsay, and even if the trial judge erroneously had admitted that hearsay, that would not have constituted an error that would entitle the petitioner to federal *habeas* relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67 (1991). "Run-of-the-mill state law errors usually do not provide a basis for federal habeas relief

51

because a habeas petitioner may obtain relief only if a state court rendered a decision 'in violation of the Constitution or laws or treaties of the United States.'" Fieldman v. Brannon, 969 F.3d 792, 800 (7th Cir. 2020) (quoting 28 U.S.C. §2254(a)). A trial judge's hearsay error, standing alone, is not a basis for federal *habeas* relief.

### 2. *Confrontation Clause Claim*

A federal court *may* consider a state court's evidentiary rulings "when those rulings implicate a federal constitutional question . . . ." Id. That means that on federal *habeas* review, the petitioner cannot raise the state-court judge's allegedly erroneous hearsay ruling unless that ruling violated the Confrontation Clause. See, *e.g.*, Makiel v. Butler, 782 F.3d 882, 907-910 (7th Cir. 2015) (reviewing Confrontation Clause claim on federal *habeas* review).

The Sixth Amendment to the Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." That right sometimes is related to the rule against hearsay—the rule that prohibits admission of out-of-court statements admitted for the truth of the matter asserted—but "not all hearsay implicates the Sixth Amendment's core concerns." Crawford v. Washington, 541 U.S. 36, 51 (2004). The Confrontation Clause applies to "testimonial" statements—such as "[s]tatements taken by police officers in the course of interrogations." Id. at 52. Such "testimonial" statements are admissible only if the witness is unavailable and the criminal defendant had a prior opportunity to be cross-examined. Id. at 68.

The first problem with the petitioner's Confrontation Clause argument is that the admission of the letter did not implicate the Confrontation Clause. As the court has explained, the words of the letter were the petitioner's own words; they were admissions of a party opponent and thus did not constitute hearsay. "[S]ince the proposition annunciated in *Crawford* only applies to hearsay, that prohibition does not cover" a criminal defendant's own statements being introduced against him by his party opponent. United States v. Tolliver, 454 F.3d 660, 665 (7th Cir. 2006) (citing United States v. Jenkins, 419 F.3d 614, 618 (7th Cir. 2005). And the Seventh Circuit has held that "testimonial" statements pertain to statements "that a declarant makes in anticipation of or with an eye toward a criminal prosecution." Id. The petitioner did not write to Randy Johnson "with any expectation that [his words] would be used against him in a criminal trial." Id.

This is not a situation in which the state presented the words of a third party without demonstrating that that third party was unavailable and giving the petitioner a prior opportunity to cross-examine. The petitioner is not objecting to *Randy Johnson's* out of court statements, or *Officer Roufus's* out-of-court statements, or *Maciewjewski's* out-of-court statements. He objects to the admission of *his own* out-of-court statements, which are not hearsay and the admission of which did not violate the Confrontation Clause.

Even if admission of the letter had violated the Confrontation Clause, the respondent argues that the petitioner procedurally defaulted on any Confrontation Clause argument because he did not fairly present a

53

Confrontation Clause argument at trial or in any of his postconviction proceedings. The petitioner responds that he fairly presented his Confrontation Clause claim because "his State [appellate] brief argument alerted the Wisconsin Court of Appeals of the alleged federal nature of the claim." Dkt. No. 27 at 4.

The petitioner did not raise a Confrontation Clause argument during the trial. The court has explained that his counsel didn't even raise a hearsay argument at trial (likely for good reason), much less Confrontation Clause claim. Nor did the petitioner mention the Confrontation Clause in his first postconviction motion. The first (and last) time the petitioner mentioned the Confrontation Clause in all his state postconviction litigation was in a single sentence in his brief on direct appeal. After asserting that Roufus's testimony was inadmissible hearsay because he wasn't the author of the police report, the petitioner said, "The United States Supreme Court stated in Bullcoming if 'a police officer report recorded an objective fact' another police officer could not introduce the information on that report, 'such testimony would violate the confrontation clause'. Bullcoming, 131 S. Ct. at 2708." Dkt. No. 24-2 at 25.

This single remark did not constitute "fair presentment" of a Confrontation Clause claim to the Wisconsin Court of Appeals. "Fair presentment requires a petitioner to put forward operative facts and controlling legal principles." Sweeney v. Carter, 361 F.3d 327, 332 (7th Cir. 2004). "Whether [he] has done so depends on several factors, including: '(1) whether the petitioner relied on federal cases that engage in constitutional

54

analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." Id. (quoting Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001)).

The petitioner's "mere passing reference" to a Confrontation Clause claim in one sentence of a thirty-five-page appellate brief, and in the middle of a paragraph making a hearsay argument, was not sufficient to put the court of appeals on notice that he was attempting to bring a Confrontation Clause claim. See Chambers v. McCaughtry, 264 F.3d 732, 738 (7th Cir. 2001) (finding the petitioner's *ex post facto* argument was not fairly presented when placed in a footnote in the middle of an argument on another point). Applying the Sweeney factors, the court concedes that the petitioner relied on a single federal case—Bullcoming—that *does* involve the Confrontation Clause. But the petitioner cited 131 S.Ct. at p. 2708. That page is *not* part of the Supreme Court's decision; it is from the syllabus, which is a summary of the case prepared by the case publication service. And the full sentence in the syllabus does not stand for the proposition the petitioner asserts. What the Bullcoming Court actually held was this:

> The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order

55

does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

Bullcoming, 564 U.S. at 652. And the petitioner did not rely on any state-court cases that applied "a constitutional analysis to similar facts."

Even if the Bulloming case had said what the petitioner claimed it said, the petitioner did not frame a Confrontation Clause claim at all, much less frame it in terms "so particular as to call to mind a specific constitutional right." The title of the section of the brief that mentioned the Confrontation Clause was "Improper Admission of Documentary Evidence, and Testimony Related to It's Admission." Dkt. No. 24-24-2 at 4. The title did not mention the Constitution or the Confrontation Clause. The majority of the section discussed authentication and hearsay. The petitioner never said, "The admission of the letter violated the Confrontation Clause, and here's why." He stated only that the court in Bullcoming had said that a certain type of testimony would violate the Confrontation Clause (and he was incorrect in that statement).

Nor did the petitioner allege a pattern of facts that was "well within the mainstream of constitutional litigation." As the court has explained, the State's use of the petitioner's own words against him did not violate the Confrontation Clause, and the petitioner has identified no case or cases holding stating otherwise. The use of a defendant's own words against him at trial—even if those words were read from a verbatim recitation contained in a police report— is not a pattern of facts that is well within the mainstream of constitutional litigation.

56

The State did not perceive the petitioner has having made a Confrontation Clause argument; it did not argue the Confrontation Clause issue in its opposition brief. Dkt. No. 24-3 at 16-19. If the petitioner had intended to make a Confrontation Clause argument, one would expect that in his reply brief, he would have called out the State for failing to address such an argument. The court cannot determine whether he did or not, because there are pages missing from his reply brief. Dkt. No. 24-4. The table of contents says that the petitioner discussed "authentication of Exhibit 64) at pages 8-9, id. at i, but the reply brief jumps from page 6 to page 10. A review of the table of authorities, however, reveals that the petitioner did not cite Bullcoming in the reply brief. Id. at ii.

The petitioner contends that the Wisconsin Court of Appeals must have perceived that he was making a Confrontation Clause claim, because it cited State v. Deadwiller, 350 Wis. 2d 138 (Wis. 2013). The petitioner is correct that Deadwiller is a Wisconsin Supreme Court case that found that a state crime lab analyst's testimony did not violate the defendant's Confrontation Clause rights because the DNA profiles upon which he relied (produced by someone else) were not testimonial. But when citing Deadwiller, the Wisconsin Court of Appeals did not mention the Confrontation Clause. Here's what the appellate court said:

> [The petitioner] also complains that Officer Roufus's testimony was hearsay. Roufus had participated in the traffic stop of Johnson but did not prepare a report on the stop. It appears that [the petitioner] objects to Roufus's testimony because the State introduced the "hit list" letter's contents by having Roufus read the typed transcript of the letter from the police report.

57

We conclude that if there is any error in allowing Roufus to read from someone else's report, it was harmless. *See* **State v. Deadwiller**, . . . 350 Wis. 2d 138, [167-68 (Wis. 2013)] . . . We note that [the petitioner] has not challenged the accuracy of the transcription. Further, Roufus, who had viewed the original letter, identified the photocopy as a true and correct copy of the letter recovered from Johnson's pocket. To avoid any hearsay problem with reading from another officer's report, the State could simply have had Roufus read from the copy of the letter itself, which was not hearsay because it purportedly contained [the petitioner's] own statement. *See* Wis. Stat. § 908.01(4)(b)1.

Dkt. No. 1-1 at 27. There is no indication in the appellate court's language that it perceived the petitioner to have been making a Confrontation Clause claim, or that it thought it was ruling on a Confrontation Clause claim. It appears to have perceived that it was ruling on a hearsay claim, and that even if there had been a hearsay problem, it would have been harmless error.[9]

By failing to fairly present his Confrontation Clause claim to the trial court and the Wisconsin Court of Appeals, the petitioner procedurally defaulted Ground One.

---

[9] Even if the appellate court had thought it was ruling on a Confrontation Clause claim, Deadwiller says that "[a] Confrontation Clause violation does not result in automatic reversal, but is subject to harmless error analysis." Deadwiller, 350 Wis. 2d at 167-68 (citations omitted). The petitioner also argues that admitting the original letter, rather than the recitation in the police report, would have helped him because the original letter was unreadable. But the harmless error standard is not based on whether the error might have helped the defendant. "An error is harmless 'if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict.' *Satterwhite v. Texas*, 486 U.S. 249, 256 . . . (1988)." United States v. Pramaggiore, 178 F.4th 1071, 1078 (2026). Given that two witnesses—one of whom was the petitioner's aunt—identified the petitioner as the murderer and matching gun magazines were found in the residence where he lived, the prosecution could make such a showing.

58

If a federal court determines that the petitioner's claim is procedurally defaulted, it must consider whether to excuse the default. Coleman v. Thompson, 501 U.S. 722, 750 (1991). A court may excuse default if the petitioner can show either (1) cause for the default and resulting prejudice or (2) that the failure to consider the federal claim will result in a fundamental miscarriage of justice. Id. (citations omitted). "[T]he existence of cause for a procedural default must ordinarily turn on whether the petitioner can show that some objective factor external to the defense impeded [the petitioner's] efforts to comply with the state's procedural rule." Murray v. Carter, 477 U.S. 478, 488 (1986).

The petitioner has not demonstrated cause and prejudice sufficient to excuse his default, nor has he shown that a miscarriage of justice will result if this court denies *habeas* relief. "Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts." Lewis v. Sternes, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). "Prejudice is established by showing that the violation of the petitioner's federal rights 'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Id. (citing United States v. Frady, 456 U.S. 152, 170 (1982)). The petitioner has not argued that any external impediment prevented him from raising his Confrontation Clause claim with the state trial or appellate courts.

59

Nor has the petitioner demonstrated that denial of his petition would result in a manifest injustice. "The fundamental-miscarriage-of-justice exception applies only in the 'extremely rare' and 'extraordinary case' where the petitioner is actually innocent of the crime for which he is imprisoned." Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003) (citing Schlup v. Delo, 513 U.S. 298 (1995)). To support a colorable claim of actual innocence, the petitioner must establish that "it was more likely than not that no reasonable juror would have convicted him light of new evidence." Id. at 679 (quoting Schlup, 513 U.S. at 316). Although the petitioner has asserted that he is innocent, he has presented no evidence to that effect. Nor has he demonstrated that any such evidence, if it existed, would make it more likely than not that no reasonable juror would have convicted him. This exception does not excuse the petitioner's procedural default.

The court must deny the petition to the extent that it is based on an alleged Confrontation Clause violation.

C.      Ineffective Assistance of Trial Counsel Claim (Ground Two)

The petitioner contends that his trial counsel was ineffective for failing to investigate and call as witnesses eyewitness Vincent Juarez and alleged alibi witness Willa Leichman to testify at trial. Dkt. No. 19 at 7. The respondent argues that the petitioner cannot show that court of appeals' rejection of the petitioner's claims was contrary to, or an unreasonable application of, Strickland v. Washington, 466 U.S. 668 (1984). Dkt. No. 41 at 21.

1.      *Failure to Investigate and Call Eyewitness Vincent Juarez*

60

"Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [the petitioner] must demonstrate that (1) his counsel's performance was deficient; and (2) that deficiency resulted in prejudice." United States v. Berg, 714 F.3d 490, 496-97 (7th Cir. 2013) (citing Strickland, 466 U.S. at 687). "The performance prong of *Strickland* requires a [petitioner] to show 'that counsel's representation fell below an objective standard of reasonableness.'" Lafler v. Cooper, 566 U.S. 156, 163 (2012) (quoting Hill v. Lockhart, 474 U.S. 52, 57 (1985)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Lafler, 566 U.S. at 163 (quoting Strickland, 466 U.S. at 694).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254 is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential", and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

Harrington, 562 U.S. at 105 (internal citations and quotations omitted).

61

"To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable.'" Jones v. Calloway, 842 F.3d 454, 464 (7th Cir. 2016) (quoting Mosley v. Atchinson, 689 F.3d 838, 848 (7th Cir. 2012)).

This court cannot conclude that the court of appeals' decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The United States Supreme Court has explained how the Sixth Amendment defines the "assistance" that lawyers provide clients, in comparison to the decisions that a client has the right to make:

> Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. United States*, 553 U.S. 242, 248 . . . (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See *Jones v. Barnes*, 463 U.S. 745, 751 . . . (1983).

McCoy v. Louisiana, 584 U.S. 414, 422 (2018). In fact, "[t]he adversary process could not function effectively if every tactical decision required client approval." Gonzalez, 553 U.S. at 249 (quoting Taylor v. Illinois, 484 U.S. 400, 418 (1988)).

> Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial. These matters can be difficult to explain to a layperson; and to require in all instances that they be approved by the client could risk

62

compromising the efficiencies and fairness that the trial process is designed to promote. In exercising professional judgment, moreover, the attorney draws upon the expertise and experience that members of the bar should bring to the trial process. In most instances, the attorney will have a better understanding of the procedural choices than the client; or at least the law should so assume.

Id. at 249-50. Put another way, "A patient can decide whether to undergo an operation, but once that decision has been taken the surgeon is in charge of implementation; so too with lawyers and trials. The defendant decides whether to go to trial and makes a few strategic decisions (such as whether to demand a jury) that shape the events, but the tactical choices rest with counsel." United States v. Boyd, 86 F.3d 719, 723 (7th Cir. 1996). One of those tactical, or strategic, decisions that is left up to counsel is whether to call a witness; "[a] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review." United States v. Williams, 106 F.3d 1362, 1367 (7th Cir. 1997).

The Wisconsin Court of Appeals cited Wood, 323 Wis. 2d 321, a Wisconsin Supreme Court case adopting the Strickland standard for an ineffective-assistance-of-counsel-claim. Dkt. No. 27-3, ¶6. In doing so, the appellate court correctly explained that it was within an attorney's discretion not to call a particular witness "if the circumstances of the case reasonably support such a decision." Id. at 5, ¶7. The appellate court determined that such circumstances existed in the petitioner's case based on his trial counsel's representation that Juarez had been unable to identify the shooter from a photo array but told police that if he saw the shooter in person, he would be able to identify him and that she believed that Juarez would be more helpful to

63

the State than to the defense. Id. at 6, ¶9. The appellate court concluded that trial counsel's reasoning was bolstered by the facts that Juarez was on the *State's* witness list and that trial counsel had said that Juarez was able to connect the shooter to Felicia Leichman. Id. For all these reasons, it was more than reasonable for the petitioner's lawyer to elect not to call Juarez as a witness.

Even if one could consider it ineffective assistance of counsel for a lawyer to decline to call a particular witness, the petitioner has failed to show that he was prejudiced by his lawyer's failure to call Juarez at trial. The petitioner believes that Juarez would have appeared in the courtroom (where the petitioner was seated and visible), taken the witness stand and testified that he witnessed the crime and that the suspect was a Black male in his late thirties, just over six feet tall, weighing 230-240 pounds with a "light complexion," which (according to the petitioner) conflicts with a police report describing the perpetrator as being six feet tall and having a "dark "compl[exion]." Dkt. No. 27 at 14-15. The petitioner does not acknowledge that it is possible that Juarez might have walked into the courtroom, taken one look at the petitioner and said, "Oh—I recognize him. He's the person I saw commit the murder." The petitioner's counsel would have been taking a huge risk by calling Juarez as a witness under that circumstance; if Juarez had identified the petitioner, there is no way defense counsel could have "unrung that bell," as the saying goes.

Even if Juarez had testified as the petitioner claims, the petitioner hasn't shown that there is a reasonable probability that the outcome of his case would

have been different, given the other evidence pointing to him as the shooter. Felicia, the petitioner's aunt, testified under oath that the petitioner had approached Baker and hit him in the head with a gun before shooting him three or four times. Jones also identified that the petitioner was the shooter. The police recovered from the place where the petitioner had stayed a pistol magazine for a .40 caliber Glock semi-automatic pistol, the same type of gun used to shoot Baker. Based on this evidence, the court cannot conclude that one alleged eyewitnesses' description of the shooter would have led the jury to find the petitioner not guilty, even if that description didn't exactly match the petitioner.

The court will deny the petition as to this claim.

      2.    *Failure to investigate and call alibi witness Willa Leichman*

One of the ways a criminal defendant can "procedurally default" on a claim—losing his right to federal *habeas* review on that claim—is if the last state court that issued judgment "'clearly and expressly' states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)). "Merits review of a habeas claim is foreclosed if the relevant state court's disposition of the claim rests on a state law ground that is adequate and independent of the merits of the federal claim." Triplett v. McDermott, 996 F.3d 825, 829 (7th Cir. 2021). "Federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds." Coleman v. Thompson, 501 U.S. 722, 729 (1991).

When considering whether a state court decision rests on independent and adequate state law grounds, federal courts look to "the last *explained* state-court judgment." Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991) (emphasis in original).

A state ground is independent "when the court actually relied on the procedural bar as an independent basis for its disposition of the case." Thompkins v. Pfister, 698 F.3d 976, 986 (7th Cir. 2012). "The test to avoid procedural default in federal court is whether the state court's decision rests on the substantive claims primarily; that is, whether there is no procedural ruling that is independent of the court's decision on the merits of the claims." Holmes v. Hardy, 608 F.3d 963, 967 (7th Cir. 2010). "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." Ylst, 501 U.S. at 801. But "a state court that separately reaches the merits of a substantive claim may also produce an independent procedural ruling that bars federal habeas review." Holmes, 608 F.3d at 967. The question is whether the state court's procedural ruling is primary. If it is, then the procedural ruling is independent. Id.

As for adequacy, a state law ground is "adequate" "when it is a firmly established and regularly followed state practice at the time it is applied." Thompkins, 698 F.3d at 986. When considering the adequacy of a state law ground, the court does not consider "whether the review by the state court was proper on the merits." Lee v. Foster, 750 F.3d 687, 694 (7th Cir. 2014).

66

State v. Allen, 274 Wis. 2d 568, 574 (Wis. 2004), requires that a postconviction motion "raise facts sufficient to entitle the movant to relief" rather than "conclusory allegations." The Seventh Circuit has held that "*Allen*'s pleading standard is an adequate and independent state procedural rule." Whyte v. Winkleski, 34 F.4th 617, 625 (7th Cir. 2022) (citations omitted). The Wisconsin Court of Appeals relied on Allen when it affirmed the circuit court's denial of the petitioner's §974.02 postconviction motion as to the petitioner's ineffective assistance claims concerning counsel's failure to call Willa Leichman as an alibi witness. Dkt. No. 27-3 at 6-7, ¶12. Citing Allen, the court explained that the postconviction motion did not provide any details of Willa's potential testimony, such as where she was when she was with the petitioner, when she was with the petitioner or what they were doing. Id. The court expressly stated: "We agree with the trial court that the claim of ineffective assistance for failure to investigate or call [Willa Leichman] is insufficiently pled." Id. at 7, ¶13. Because the court of appeals relied on Allen in rejecting the petitioner's ineffective assistance of trial counsel claim concerning Willa Leichman, that claim is procedurally defaulted and the court must dismiss it.

For what it is worth, even if the petitioner had not procedurally defaulted on this claim, he could not have proven that his counsel's performance was deficient. Again, whether to call a witness is a tactical or strategic decision left to counsel. The petitioner has not demonstrated that his attorney's failure to call Willa was unreasonable. If the petitioner was, in fact, with Willa Leichman on the evening of the murder, the petitioner (and his mother) would have

67

known that long before the defendant even met his lawyer. One would assume that the moment he met his attorney, he would have told her that he had an alibi—that he was with his mother that evening, and that she cooked him chicken. The petitioner has given no explanation for why he believes his lawyer should have had to investigate or figure out whether he had an alibi when, if he was with his mother, he had the ability to give his lawyer that alibi. He does not explain why he did not raise the details of the alibi until long after his trial was over, and why he released those details (including his mother's affidavit) in dribs and drabs during his postconviction filings. Even if the petitioner had not procedurally defaulted on this claim, he could not have proven that his counsel was ineffective for failing to raise the claim. The court will deny the petition as to this claim.

     D.    <u>Due Process Claim (Ground Three)</u>

The petitioner alleges a denial of his due process rights based on new evidence of his actual innocence. Dkt. No. 19 at 8. The alleged "new evidence" consists of a March 4, 2014 affidavit from Felicia Leichman in which she admitted to lying during her trial testimony; a June 13, 2014 report from a private investigator who said he'd talked to Felicia Leichman on the phone and she'd admitted to him that she'd lied at the trial; and an affidavit from Robert Berndt, a person incarcerated at Green Bay Correctional Institution who stated that he was at the scene of the shooting and that the petitioner is not the person he saw shoot the victim. <u>Id.</u>

The Supreme Court has held that "the existence of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." Townsend v. Sain, 372 U.S. 293, 317 (1963). "For claims based on newly discovered evidence to state a ground for federal habeas relief, they must relate to a constitutional violation independent of any claim of innocence." Johnson v. Bett, 349 F.3d 1030, 1038 (7th Cir. 2003) (citing Herrera v. Collins, 506 U.S. 390 (1993)).

"As a general rule, newly discovered evidence that bears only on the question of guilt or innocence is not reviewable by a federal court on a motion for habeas corpus relief." Moore v. Casperson, 345 F.3d 474, 491 (7th Cir. 2003) (quoting Coogan v. McCaughtry, 958 F.2d 793, 901 (7th Cir. 1992)). The Seventh Circuit has explained that "in some situations newly discovered evidence is so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial in which the evidence could be considered." Id. But "[w]here the 'newly discovered evidence' consists of witness recantation of trial testimony or confessions by others of the crime, most courts decline to consider it in the absence of any showing that the prosecution knowingly proffered the false testimony or failed to disclose exculpatory evidence, or that petitioner's counsel was ineffective." Id.

The petitioner's newly discovered evidence bears only on the question of guilt or innocence. He says that Felicia has recanted her testimony that she saw the petitioner shoot and kill Baker. This recantation falls within the bucket

of "newly discovered evidence" that a court must decline to consider absent any showing that the prosecution knowingly proffered the false testimony or failed to disclose evidence or that the petitioner's counsel was ineffective. Moore, 345 F.3d at 491. The petitioner has not established, or even argued, that the prosecutor knew that Felicia's testimony was untrue, that the prosecutor failed to disclose evidence or that the petitioner's trial counsel somehow was ineffective (perhaps by failing to impeach Felicia's testimony to show that it was false).

Nor has the petitioner shown that the private investigator's information would have proven his innocence. The petitioner neglects to explain that despite his efforts, the investigator was unable to speak with Felicia Leichman in person. Dkt. No. 27-1 at 3. The investigator stated that he tried to contact Felica "many times" but that she wouldn't return his calls; he tried to meet with her at her residence but learned she'd moved; he tried to meet her at her job and found she no longer worked there. Id. The investigator was able to reach Felicia only by cell phone; after she told him that she was pressured to implicate the petitioner, the investigator told her he had to meet with her. Id. When the investigator tried to call to set up an appointment to meet with Felicia, however, she did not answer the phone or return his calls. Id. None of this demonstrates the petitioner's actual innocence; it is another version of Felicia's recantation of her trial testimony, which is not the kind of newly-discovered evidence that proves actual innocence.

70

Finally, the petitioner has not demonstrated that the prosecutor failed to disclose Berndt as a possible witness or that the petitioner's counsel was ineffective for failing to call Berndt as a witness. He has not shown that Berndt's purported testimony is "so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial in which the evidence could be considered." Id. As the court of appeals explained in its denial of the postconviction motion, Berndt stated that he heard gunshots and saw "flashes of light in a small crowd of people across the street," then saw a tall man with light complexion, low haircut and black t-shirt run past with a gun in his hand. Dkt. No. 24-19 at 3. The court reasoned that nothing in Berndt's affidavit would undermine the evidence presented at trial—Felicia's and Jones's testimony that they both witnessed the petitioner shoot Baker, the petitioner's letter instructing Randy Johnson to take care of witnesses and a pistol magazine for a .40 caliber Glock semi-automatic pistol found at the petitioner's residence. Id. at 4-5. There is no evidence that Berndt witnessed the actual shooting and he did not identify the shooter, so the petitioner has not shown that failure to present this "new" evidence violates the fundamental fairness embodied in the Due Process Clause.

The court will deny the petition on this ground, and on all grounds.

## IV. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. See also 28 U.S.C.

§2253(c)(1). This requirement exists because "[a] state prisoner whose petition for a writ of *habeas corpus* is denied by a federal district court does not enjoy an absolute right to appeal." <u>Buck v. Davis</u>, 580 U.S. 100, 115 (2017). This court may issue a certificate of appealability only if the petitioner makes a substantial showing of the denial of a constitutional right. <u>See</u> 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Peterson v. Douma</u>, 751 F.3d 524, 528 (7th Cir. 2014) (citing <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)). The court declines to issue a certificate of appealability because a reasonable jurist would not debate whether the petitioner is entitled to relief under 28 U.S.C. §2254(d).

## V.    Conclusion

The court **DENIES** the amended petition for writ of *habeas corpus*. Dkt. No. 1.

The court **DECLINES** to issue a certificate of appealability.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 31st day of July, 2026.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**United States District Judge**

72